## GEORGE LOWNSBERRY V. J. W. RAKESTRAW.

1. CASE MADE; *When to be Filed.* It is not essential to the validity of a case made that it be filed with the clerk immediately after it has been settled and signed by the judge; it is enough if it be so filed within a reasonable time. In a district composed of several counties two months and a half is not an unreasonable delay in so filing a case made. *Quære:* Would an unreasonable delay in filing affect the validity of a case made?

2. OSAGE LANDS; *Treaty Rights, how Determined.* Where the determination of any question involving discretion is committed to any officer or tribunal within the limits of the jurisdiction conferred, his or their decision is conclusive thereof, and can be attacked collaterally only for fraud.

3. —————— So, when it was provided by treaty that the Osage "half-breeds, not to exceed twenty-five in number who have improvements on the north-half of the lands sold to the United States shall have a

patent, said half-breeds to be designated by the chiefs and head-men of the tribe," *held*, that the designation by such chiefs and head-men was conclusive as to the right of the party designated to receive a patent, and that in a suit brought by the grantee of such patentee to recover possession of the land, no inquiry could be made into the question whether such patentee was a half-breed of the Osage tribe, or whether he had any improvements on the north-half of the land sold to the United States.

4. —————— Where it was also provided by treaty that such designated half-breeds should receive patents for eighty acres each, "to include as far as practicable their improvements, all of said lands to be selected by the parties, subject to the approval of the Secretary of the Interior," *held*, that a selection of an eighty-acre tract by one of the designated half-breeds, and the approval of that selection by the Secretary of the Interior, gave to such half-breed a vested interest in the land, and was conclusive as against all persons claiming title acquired subsequently to the selection, and that the holder of subsequently-acquired title could not show as a defense to an action brought by the grantee of such half-breed that such half-breed never had any improvements on the land.

5. —————— Where the land selected was incorrectly reported to the Secretary of the Interior, the mistake could be corrected, even though the patent had already issued and the correct selection submitted to his approval; but where the party making the selection is aware of the mistake, makes no objection thereto, or effort to have it corrected, and assents to its submission to the Secretary for approval, *held*, that such action was virtually a selection of the tract reported to the Secretary.

*Error from Neosho District Court.*

EJECTMENT, brought by *Lownsberry*, to recover possession of Lot No. 3, and the S.E.¼ of the N.W.¼ of section 4, in township 29 south, of range 20 east, containing 80.42 acres, in Neosho county, which plaintiff claimed to own in fee simple. *Rakestraw* answered, claiming title to said lands in virtue of certain rights acquired under a settlement thereon made by him in January 1866, and a purchase made under the joint-resolution passed by congress April 10th 1869. The land in controversy is part of the Osage lands conveyed to the United States by the Treaty of September 29th, 1865, (January 21st, 1867.) *Lownsberry* claimed as grantee of one William Tinker, a member of the Osage

tribe of Indians. *Rakestraw* not only claimed title in himself, as above stated, but he contended that the land *patented* to Tinker was not the land which had been *selected* for him, and that for this reason the patent was void, and plaintiff's title therefore failed. The record is very voluminous. The facts are sufficiently stated in the opinion, *infra*. Trial at the December Term 1872. Verdict and judgment for defendant, and *Lownsberry* brings the case here on error.

*C. F. Hutchings*, for plaintiff in error.

*Stillwell & Baylies*, for defendant in error.

The opinion of the court was delivered by

BREWER, J.: As a preliminary question, counsel for defendant in error insist that there was such a defect in the proceedings to make a case as is fatal to its validity, and that therefore there is nothing before us for examination. The case was signed May 1st 1873, but was not filed with the papers in the case until July 18th 1873. This it is claimed is fatal. The law in force at the time, as claimed by counsel, reads thus: "The case and amendments shall be submitted to the judge, who shall settle and sign the same, and cause it to be attested by the clerk, and the seal of the court to be thereto attached. It shall then be filed with the papers in the case." Laws 1871, p. 274, § 1. We are inclined to think the law applicable to this case must be found in § 1 of ch. 85, Laws of 1870, p. 168, but it is, so far as this question is concerned, wholly immaterial which statute governs; the only difference being, that in the latter the word "*thereupon*" is used, instead of "*then*." We do not consider the objection well taken. The law does not make an immediate filing a condition of validity. The case of *Brown v. Rhodes*, 1 Kas., 363, is cited as authority, but the reasoning of the court in that case shows that it is inapplicable. The question there arose as to the validity of a bill of exceptions filed two years and three months after the adjournment of the trial-term. The court held that "the records of a term of

*1. Case made; when to be filed.*

11—14 KAS.

court are made during the term, and under the direction of the court;" that a bill of exceptions must be filed to become a part of the record, and that therefore it must be filed during the term to become a part of the record of that term. But with a case-made the rule is different. Express authority is given to extend the time for making it beyond the term, and there is no statutory limit within which it must be completed. The judge may fix the time within which the case must be made, that within which it must be served, that within which amendments thereto must be suggested, and the notice that must be given of the time of its presentation for settlement. When so presented it is his duty to settle, sign and certify to it, and then it shall be filed with the clerk. But "then" does not mean the same day, for the judge may be several days' journey away from the clerk's office. It does not mean at the same term, for the term may long since have adjourned.

Should be filed within reasonable time. The most that can be claimed is, that it means that the case must be filed within a reasonable time. We do not decide that even that is essential to its validity. It may be claimed with much force that the time of filing is an immaterial matter — that the signature of the judge is the essential thing, and that even an unreasonable delay in filing will not affect its validity. It will be time enough however to decide that question when it is fairly before us. It is enough for this case to hold that it is sufficient if the case be filed within a reasonable time after it has been settled and signed, and that two months and a half is not, in a district composed of several counties, *prima facie* an unreasonable delay. We are compelled therefore to examine into the questions presented in the record.

The material facts are as follows: On the 29th of September 1865 the Osage Indians made a treaty with the United

Statement of facts. States, which was ratified and proclaimed January 21st 1867, (14 U. S. Stat., 687,) by which they conveyed certain lands to the government "to be surveyed and sold under the direction of the Secretary of the Interior on the most advantageous terms for cash; * * *

but no pre-emption or homestead settlement shall be recognized, and after reimbursing the United States the cost of said survey and sale, * * * the remaining proceeds of sales shall be placed in the treasury of the United States to the credit of the civilization fund," etc., (see 1st article treaty.) By the 14th article it is provided that "the half-breeds of the Osage tribe of Indians, not to exceed twenty-five in number, who have improvements on the north-half of the lands sold to the United States, shall have a patent issued to them in fee simple for eighty acres each, to include as far as practicable their improvements, said half-breeds to be designated by the chiefs and head-men of the tribe, * * * and all of said lands to be *selected* by the parties, subject to the approval of the Secretary of the Interior." On the 10th of April 1869 congress passed the following joint resolution:

"*Resolved by the Senate and House of Representatives of the United States of America in congress assembled,* That any *bona fide* settler residing on any portion of the lands sold to the United States, by virtue of the first and second articles of the treaty concluded between the United States and the Great and Little Osage tribe of Indians, September 29th 1865, and proclaimed January January 21st 1867, who is a citizen of the United States, or shall have declared his intention to become a citizen of the United States, shall be and hereby is entitled to purchase the same in quantity not exceeding 160 acres, at the price of $1.25 per acre, within two years from the passage of this act, under such rules and regulations as may be prescribed by the Secretary of the Interior: *Provided however,* That both the odd and even-numbered sections of said lands shall be subject to settlement and sale as above provided: *And provided further,* That the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for state school purposes in accordance with the provisions of the act of admission of the state of Kansas: *Provided however,* That nothing in this act shall be construed in any manner affecting any legal rights heretofore vested in any other party or parties."

In September 1867 the twenty-five half-breeds were "designated by the chiefs and head-men," and the "lands selected by the parties," as provided in said 14th article. William

Tinker was designated as one of these half-breeds, made his selection, and thereafter a patent for the land in controversy was issued to him, of date June 10th 1870, which recites that it was issued under the 14th article, and shows the approval on the 15th of June 1869 by the Secretary of the Interior of the selection. On September 30th 1870, Tinker and wife deeded to Lownsberry, and this was his chain of title. In January 1866 Rakestraw moved upon the land, made improvements upon it, and afterward, having all the personal qualifications requisite, obtained a duplicate receipt for it under the joint resolution of 1869, though this receipt was thereafter canceled by the officers of the land-office, as issued by mistake. It appears probable from the testimony that, prior to Rakestraw's occupation, and prior to the treaty, there had been some improvements on the land, though whether owned by Tinker, or not, is doubtful, but that all had been removed or destroyed prior to those dates. It was claimed that the land selected by Tinker was not the land embraced in the patent, and that through some mistake or design a change had been made intermediate the selection and the patent. Upon these facts the court charged the jury as follows:

"Should you therefore find from the evidence that on the 29th day of September 1865, (that being the date of said treaty,) the said William Tinker had no improvement, as hereinbefore defined, on the land in controversy, and that long prior to the issuing of said patent to William Tinker for the land in controversy the defendant Rakestraw had a lawful and *bona fide* settlement upon said land, as defendant has in his answer averred, the issuing of the patent to Tinker in itself would not operate to divest defendant of any rights he may have acquired before the issuing of said patent by virtue of settlement and improvements."

The court also refused this instruction:

"If the jury find from the evidence that the chiefs and head-men of the tribe, before the 10th day of April 1869, designated William Tinker as one of the half-breeds of the Osage tribe of Indians who should have a patent for eighty acres of land under the provisions of the 14th article of the

treaty of Sept. 29, 1865, and that the said Tinker selected the land in controversy before the 10th of April 1869, and his selection was afterward approved by the Secretary of the Interior, then the said Tinker had on the 10th of April 1869 a vested right in the land in controversy, and the defendant could obtain no title to the same as against Tinker or his grantees by purchase under the joint-resolution of congress approved April 10th 1869."

The same rulings appear elsewhere in instructions given and refused. In their brief, counsel say:

"The fact that said Tinker was designated as one of the twenty-five of the Osage tribe of Indians entitled to patents is not questioned by defendant in error, as the case now stands; but the two vital points we rely on in opposition to his right to rightfully receive a patent for the land in controversy are, 1st, that he never had any improvements on said land; and 2d, that he never *selected* said land as his head-right."

In these rulings we think the learned court erred. Prior to April 10th, 1869, Rakestraw's possession and occupancy gave him no rights in the land. He was simply a naked trespasser, whose possession, no matter how long continued, could never ripen into a title. *Wood v. The M. K. & T. Rly. Co.*, 11 Kas., 323. It is therefore, so far as respects the acquiring by other parties of any title from the United States under the provisions of the treaty, as though the land were wholly unoccupied and vacant. While it is true that only such half-breed Osages as had improvements on the north-half of the lands were to be entitled to patents, yet the treaty provided a tribunal for determining who should thus receive patents, and the determination of that tribunal is conclusive. Testimony is no more admissible to show that William Tinker was not an Osage half-breed, or that he had no improvements on the north-half of the land, than it would be after the final determination of this case, to show that the facts upon which the judgment was based did not exist. *United States v. Arredondo*, 6 Peters, 729. Counsel in their brief do not seem to contest this proposition, or at least do not rest their case upon any denial of it; nor did the court instruct the jury in direct opposition thereto, though it refused

2. Rights under treaty, how determined.

an instruction asserting it, and did charge the jury that Tinker must have possessed the qualifications named to be entitled to a patent. Such ruling would be very apt to convey a wrong impression to the jury. The treaty not only provided for designating the individuals, but for the selection of their lands, giving to the individuals named the privilege of making this selection, subject only to the approval of the Secretary of the Interior. And while it contemplated that such selections should include their improvements, yet it did not make this absolutely imperative. It says, "as far as practicable." It thus contemplated the possibility of selections outside of improvements. Perhaps the selection of one half-breed would cover the improvements of another as well as his own. Perhaps other selections authorized by the treaty might conflict. Perhaps there might be conflicting titles to the same improvements. Whatever may have been the reason, the fact is apparent, that the treaty contemplated the possibility that some selections might not cover the party's improvements. Hence, the mere fact that the selection did not include the party's improvements would not necessarily defeat the selection.

Again, it provided for a selection subject to the approval of the Secretary of the Interior. Such approval was conclusive as against any rights which did not exist at the time of the selection. The approval related back to the selection, and confirmed it. The title thus acquired was good as against any one who did not then have a better claim. The only parties who at the time had any interest or rights in this land were the Osage Indians, the government, and Tinker. No one else could question the validity of the selection. So that, whether Tinker had any improvements on the land at the time he made his selection, or not, is a matter into which Rakestraw, holding by a subsequently-acquired title, cannot be permitted to inquire. This ruling compels a reversal of the judgment, and the remanding of the case for a new trial. It will also have the effect of excluding on such subsequent trial much of the evidence offered on this trial.

The question of an error between the selection and the patent, we have not as yet considered, but perhaps should notice before closing. It is claimed that the land actually selected was the E.½ of N.W.¼ of sec. 9, instead of the land in controversy. It is true, that if Tinker selected one piece of land, and by mistake another was reported to the Secretary of the Interior for approval, the error could be corrected, even though the matter had gone so far as the issue of the patent, and the actual selection might still be submitted to the Secretary for his approval; but it is equally true that, if Tinker, before the 10th of April 1869, became aware of the fact that a mistake had been made in the tract of land reported as his selection, made no effort to correct the mistake, and assented to its being thus presented to the Secretary for approval, it was virtually a selection by him of the tract reported, and the approval of the Secretary confirmed the title in him as of date prior to any rights which Rakestraw could acquire by his occupancy. We do not care to pursue this inquiry further, for we cannot anticipate the testimony which may be offered on the next trial.

The judgment will be reversed, and the case remanded for a new trial.

All the Justices concurring.