## THE STATE OF KANSAS V. BARNEY BOHAN.

1. BILL OF EXCEPTIONS — *Must be Regularly Settled; Agreed Statements of Counsel, and Mere Certificates of Clerk, Disregarded.* Neither the certificate of the clerk of a district court, nor the agreed statement of counsel as to what occurred at a trial, can be made to supply the place of a bill of exceptions taken in accordance with the statute; and when matter is sought to be brought into the record by such means, it will be disregarded by the supreme court.

2. ———— *Waiver, by Counsel, and Nunc Pro Tunc Order, Void.* Where a criminal case was tried at the February term of the district court, and the regular term next after that of the trial commenced on the 29th of May following, and a bill of exceptions of the proceedings of the trial was not presented or allowed, or signed, or filed, until June 5th, and during the said May term, such bill is unauthorized by law, and no part of the record; and *held,* that a waiver by counsel of the time such bill of exceptions was taken and the manner it was made will not cure the fatal defect as to said exceptions; and *held also,* that an order of said district court of the said May term to have the said bill of exceptions entered as having been presented and allowed as of a previous term of the court, is a nullity. The court has no power, by this mode, of extending the time for the making and signing and filing a bill of exceptions beyond the term.

3. TERMS OF COURT; *Adjournments.* Where the February term of the district court was continued to the 24th of May next thereafter, and the court did not convene on the said 24th pursuant to adjournment, the court is legally open until it adjourns *sine die,* or expires by law.

4. CHANGE OF VENUE; *Prejudice of Judge, on New Trial.* Neither unfavorable comments as to the innocence of a defendant in a criminal case, after a verdict of guilty by a jury, made by a trial judge upon the evidence introduced in the case, when passing sentence upon such defendant, nor adverse rulings, nor errors of judgment, of themselves amount to prejudice on the part of a judge so as to compel a removal of the case (upon a new trial granted by the supreme court) to the district court of some county in a different judicial district.

5. DRAWING JURORS; *Attendance of Deputy-Sheriff.* The mere fact that a deputy-sheriff was present at the county clerk's office to attend and witness the drawing of a jury, and after such drawing signed the certificate of the drawing with the county clerk and the two justices of the peace of the county, who also attended such drawing in accordance with the act for the selection of jurors, where the names of all the jurors were drawn from the jury box by such county clerk in the presence of all of such parties, furnishes no cause to discharge or set aside the jurors so drawn.

6. HOMICIDE; *Self-Defense; Instructions.* Upon the trial of a defendant charged with murder, where the defense is made solely on the ground that the homicide was justifiable, as having been committed in self-defense, *held,* that the instructions as to the defense are not erroneous when it clearly appears therefrom that the jury were directed that all the law demands is, that there shall be reasonable apprehensions of imminent danger, and of the reasonableness of this apprehension the jury are to be the judges, but the threats and circumstances upon which this apprehension rests must not only tend to lead to the belief of such danger, but they must force the belief upon the mind, and then the belief must be reasonable, and such as reasonable men act on.

### Appeal from Saline District Court.

INFORMATION for murder, charging *Bohan* with the felonious killing of Thomas Anderson, at the county of Saline, in November 1874. *Bohan* was tried at the March Term 1875 of the district court, found guilty of murder in the second degree, and sentenced to confinement in the penitentiary for twenty years. On his appeal to this court, such sentence was set aside, and a new trial granted. (15 Kas. 407 to 419.) A second trial was had at the February Term 1876 of the district court. *Bohan* was again convicted of murder in the second degree, and was sentenced to confinement in the penitentiary for the term of his natural life; and he now again appeals to this court. The errors complained of, and many of the facts, are stated and discussed in the briefs of counsel. Other questions of fact, and several questions of practice, will appear in the opinion, *infra.* The charge to the jury (upon which several errors are assigned,) is very voluminous. After defining and explaining the several degrees of felonious homicide, and defining the terms "maliciously," "purposely," "deliberately," and "premeditatedly," the court read the information, and then further instructed the jury as follows:

—To this charge so stated in the information, the defendant has pleaded "not guilty." He is therefore to be considered by you innocent, until proven guilty beyond a reasonable doubt—innocent of the crime charged, and innocent of each and every element and ingredient of such crime; innocent of the facts alleged, and innocent of any guilty intent or connection therewith. With this presumption of innocence the

law has for ages wisely and properly invested all defendants charged with crime, and you should give this defendant on trial the benefit of this presumption of innocence in the outset, and let it run with him throughout the trial, until it shall be overthrown by the testimony, when applied to the law, and his guilt appears beyond a reasonable doubt. And where there is a reasonable doubt in your minds in which of two or more degrees the defendant is guilty, you can convict of the lowest degree only.

In contemplation of law, the charge against the defendant covers and includes the two degrees of murder, and the four degrees of manslaughter known to and defined by our statute; and by the law of this state you are to consider each and all of these degrees; and you can find the defendant guilty of either, or neither, of these crimes, as you may think the facts and the law will warrant. * * *

What then are excusable and justifiable homicide? These are defined by our statutes, and I quote sections 9 and 10 therefrom. [*Here the court read said sections from the statute, Gen. Stat. pp. 319, 320.*] And again, at common law homicide is excusable "when one in doing a lawful act, without any intent to hurt, unfortunately chances to kill another;" and justifiable homicide, for the purposes of this case, is covered by the foregoing statutory definitions. If then, the alleged homicide in this case was committed under such circumstances as, or in a case where, by our statute or by the common law, such homicide was justifiable, or excusable, you must return a verdict of not guilty.

Manslaughter at the common law is, "where the alleged killing happens either on a sudden quarrel, or in the commission of an unlawful act, without any deliberate intent of doing any mischief at all." * * *

The counsel for the defendant in the opening of their case to you, stated, among other things, that they admitted the killing, but said the defendant was justified; or in other words, that this is a case of justifiable homicide. The defendant on the stand admitted the killing, but said he did it through fear of injury. The question then, whether this was justifiable homicide, or not, seems to be the principal question in this case.

In giving you the definition of justifiable homicide, as prescribed by our statutes, I use mainly the language of section 9 of our crimes act. It is, "when committed in lawful defense" of any person, "when there shall be a reasonable cause

to apprehend a design to commit a felony, or to do some great personal injury, and there shall be immediate danger of such design being accomplished." And with reference to this question our supreme court has laid down the following rule: "On a trial for murder, if the defendant relies on a supposed necessity for the killing as a justification or excuse, the rule to be applied is, that the accused must have believed that he was in immediate and actual danger of his life from the deceased, and his belief must rest on reasonable grounds, and the party from whom the danger is apprehended must be making some attempt to execute his design, or at least be in an apparent situation to do so, and thereby induce a reasonable belief that he intends to do so immediately." A defendant cannot then be excused because he thought he was justified, or thought that he was in immediate peril; but his belief must have been well founded on reasonable circumstances.

The law of self-defense rests in and is founded upon the natural right of every man to protect his own life and person against every unlawful assault upon them by another. When this defense is therefore made in any case of homicide, a jury should listen to it, and *carefully* weigh the circumstances of the killing, in connection with all the other testimony in the case. Mere apprehension that a person designs to kill another, or to commit personal injury upon him, is not sufficient to authorize such other to commence an attack, and to take life. Such an act would be murder. But in cases where a person attacks another, attempting to execute such a design upon life or person immediately, or attacks and is in an apparent situation so to do, thereby creating a reasonable belief in such other that such design is about to be accomplished immediately, then such other can take the life of such assailant, and it is justifiable homicide.

And again, another rule: When from the nature of an attack, and the circumstances immediately preceding it, there is reasonable ground for a man to believe, and he does believe, that there is a design to destroy his life, or commit any felony upon his person, the killing of the assailant will be justifiable homicide, although it should afterward appear that no felony was intended. The rule being, you should judge a defendant under the circumstances in which he was placed; and if a reasonable and judicious man would have been alike honestly mistaken as to the reality of the danger, then you should excuse him.

The law allows also an individual in defense of his person

or property to use such *means* as are necessary. In the situation and use of these means, he must of necessity exercise his own judgment; but he acts at his peril, and if he goes beyond what is necessary to accomplish the object, and violates the law, he must abide the consequences. In the exercise of his judgment he must act rationally. On this question of excusable or justifiable homicide, you should carefully examine and consider all of the testimony in the case, both for the prosecution and for the defense; and then if there should remain in your minds a reasonable doubt as to whether the homicide was excusable or justifiable, and as to whether a crime had been committed or not, you should give the defendant the benefit of that doubt, and acquit.

We now draw towards the testimony in this case. In deciding the question then, as to whether this was a case of justifiable homicide or not, you should first decide the position and condition of the parties when the killing took place; what the deceased was doing; where he was; his physical condition; what dangerous weapons he had, if any; how the parties came together; what caused the shot; where the defendant got his weapon, and at what precise point of time the defendant fired that fatal shot; and in fine, as to all the circumstances of the transaction, and then apply the rules I have given you, and say if the defendant's life was then and there in immediate danger of being taken — if he thought so, and if he had reasonable grounds so to think.

It seems that a scuffle (as it has been termed) was had between the defendant and the deceased, and others, and the defendant was taken and put out of the saloon into the barber-shop. Now I say to you, that, according to the testimony, nothing had been done up to this time upon the part of the deceased that should warrant the defendant by any means to take his life; and the defendant has testified on the stand that he did not shoot the deceased on account of this scuffle, or any prior difficulty. You should then consider what the defendant was doing while he was out of the saloon. The testimony varies perhaps as to the time that elapsed from the time defendant was put out of the saloon until he did the shooting. Here was time for reflection, deliberation and premeditation, for the defendant to decide what he would do. And if you should believe the defendant during this time formed the intention to kill the deceased, and then in pursuance of such intention should go and kill him, whether he went back into the saloon and did so, or whether he stood on

the outside, it would be murder in one of the degrees according as you might find deliberation and premeditation, as I have defined them.

The defendant had no right to return into the saloon and to renew or commence an attack on the deceased, and if he should do so he would be responsible for all that followed. No man has a right to commence an attack upon another and then, if he should kill his adversary in the fight growing out of such attack of his, to screen himself behind the plea of self-defense. But if you should believe that defendant during this time he was out of the saloon did not form any intent to kill the deceased, or to renew the attack or quarrel, then I say to you that he had the right to return into the saloon, it being his, and to remain there, about his lawful business, as proprietor or otherwise; for no man is obliged to flee from his own property; and if the deceased should attack him, either by himself, or together with his brother William, (if the defendant should so return,) and the defendant should then kill the deceased, you should then ask yourselves if it was done in self-defense; that is, if it was justifiable, and he was in the danger I have described above. But if in such a case the two brothers should attack the defendant, and the defendant was in the imminent peril that I have mentioned from the one only, then he should kill that one only, and not the other. He should go only so far as necessary, and do only such acts as were necessary for his own defense. If the two should attack him, and you should believe he killed William first, or disabled him, so he was in danger no longer from him, you should then inquire of the condition of things as between defendant and Thomas, and ask yourselves if it was necessary to kill him also. Upon this precise point the defendant testified on the stand, on the direct examination, that he shot William first; and then on cross-examination, after giving the position of Thomas with a billiard cue in his hand, said substantially among other things, and for his reason of killing, that he shot him solely and alone because he had that billiard cue in his hand, and for the reason he was coming at him; that he had nothing against him in the world. And upon questions of his own counsel, he enlarged, and said, "The only reason I shot him was, I made up my mind I could not get away from him without his striking me, and if he hit me I was a goner. He was coming at me at the time." Now if you should believe this testimony of the defendant, and believe that the positions of the parties and circumstances at

the time the shooting took place were as testified to by defendant, then you should ask yourselves, under the rules I have given you, if under those circumstances it was necessary to kill Thomas, and that defendant was justified in so doing. In whatever position you should find and believe the parties were in at the time of giving the fatal shot to Thomas, you should apply the same rules. * * *

The testimony of W. B. Tuitt as to the statements of the defendant was admitted upon the question of malice, and for the purpose only as may throw light upon the condition of the mind of the defendant at the time of the shooting, toward Thomas Anderson, and the acts defendant committed upon him. And you should remember that the malice you are to find in this case is malice in the killing of Thomas. With the killing of William, or the malice in his killing, you having nothing to do, only so far as you may think they are so intimately and instantaneously connected, that the one transaction may and does throw light upon and characterize the other.

You are the exclusive judges of the testimony, as to its weight, and the credibility of the witnesses. It is for you to say what has been proven, or disproven; and you are to try and to decide this case upon the case as made in court. You cannot under your oaths take into consideration any belief you may have had, or suppose occurrences about the transaction charged. Take the testimony in the case, and with such reason, judgment, and discretion as you have, together with such general knowledge as is common to all mankind; apply the facts to the law I have given, and make up your verdict accordingly.

In summing up the testimony upon any given question, you should not alone count witnesses. It is not always the most satisfactory, neither is it the most certain of the truth. The questions are, What did the witness swear to? How much did he know? Was he positive, or uncertain and equivocating? What were his means of knowledge of the transactions or matters he testified about? What is the character of the witness for truthfulness? Is he credible? What interest has he in the result of the trial? or what friendship for either party, or ill-feeling toward the other, that would be liable to swerve him from the truth? What was the appearance and demeanor of the witness on the stand? How does his story harmonize with the main and certain facts of the case? Has he testified falsely, knowingly, upon any ma-

terial point in the case; and if so, is he worthy of belief at all? And in case of the defendant, you have the right to take into consideration the great interest he has in your verdict.

It has leaked in here during the trial, in one way and another, that this defendant has been heretofore tried for the killing of Wm. N. Anderson, and acquitted, and heretofore tried in this case and convicted, and a new trial ordered. With these matters you have nothing to do. You do not know the circumstances under which those verdicts were given. The testimony may have been quite different from that before you now. For these and many other good reasons, I say to you, you should not consider them, or either of them, for a moment. Let them therefore I beseech you be stripped from your minds, and decide this case under your own judgments and consciences, on the law and testimony of this case. You would be untrue to yourselves, indeed, if you should let the opinions of others answer for you in this case, or let them bias or swerve you in the least.

Other portions of the instructions are omitted, not being complained of. The jury found the defendant guilty as charged, and he brings the case here on appeal.

*Stillings & Fenlon, J. G. Mohler*, and *J. G. Spivey*, for appellant:

This is probably the most peculiar case ever tried in the courts of Kansas. On the 3d of November 1874, at Brookville, in the county of Salina, the defendant Bohan killed Thomas Anderson and William N. Anderson at the same time, and under precisely the same circumstances. At the term of said court immediately following the homicide, informations were filed, charging Bohan with the murder of both of said persons—there being two informations, charging two separate murders. At the same term of court, the case for the killing of Thomas Anderson was tried, and the defendant was convicted of murder in the second degree, and sentenced by the court to confinement and hard labor for twenty years. (*The State v. Bohan*, 15 Kas. 407.) At the next term of the court, March 1875, the trial of defendant for the killing of William N. Anderson was had, and he was

*acquitted* of the alleged crime. The entire record of the case here, and in *The State v. Bohan*, 15 Kas. 407, shows beyond all question that the killing of the two men, Thomas and William N., was done under precisely the same circumstances. If the killing of William N. Anderson was not a crime, it is impossible that the killing of Thomas Anderson could be one; for upon the testimony it would be absurd to say, that he was guilty of a felonious homicide in the one case, and wholly innocent in the other. Of course we do not deny the proposition that on the same facts one jury might differ from another; but when we remember that the defendant shot and killed both Thomas and William N. at the same time—that he was tried a few days after the act, against his protest, and convicted for the felonious homicide of Thomas, and a few months afterward was tried in the same locality for the felonious homicide of William, and honorably acquitted, it is at least reasonable to believe that such first verdict was the result of prejudice, passion, and local and misinformed opinion. As a circumstance in the case, we have a right to assume that at the trial for the killing of William N. Anderson, the public mind had settled down to fairness and justice —was then in a condition to judge a man as he should be judged—that the passion and excitement, the frenzy, which we all know takes possession of the people upon the *appearance* of a great crime, had passed away, and that on the second trial, judgment, discretion and calmness had supplanted excitement and frenzy. And we submit, that on general principles, the record of this case exhibits a state of affairs that not only justify but demand a reversal of the judgment herein; that outside of specific error, an ignorance upon the part of the jury, a prejudice on the part of the court, and a fear of popular opinion on his part, produced the rulings and judgment to which we object, and which by every just principle of the administration of criminal law, we demand shall be reversed. It is unparalleled in the history of judicial proceedings, that precisely the same acts, done exactly at the same time, under the same circumstances, can in law and in

fact, be an innocent act, and a guilty act — a crime, and not a crime. Yet to this result have we come in this case. In view of the singular history of this case, and its surroundings, a more than ordinary fine sight should be drawn on this judgment; and yet we claim this is not necessary, for we contend that most flagrant errors have been committed.

1. When the case was called for hearing, the defendant filed his petition for a change of venue, on account of the prejudice of the presiding judge, and testimony was introduced on said application, from which it appears that the judge had previously refused to change the venue, and compelled a trial in the midst of a highly-excited state of public clamor; that he had during the trial admitted testimony against the defendant in defiance of rulings of the supreme court, which were presented to him at the time; that such ruling against the defendant was condemned by the supreme court, in 15 Kas. 411. By the fair weight of the evidence, it is shown that he had expressed his deliberate conviction in the case, prior to this trial thereof. The record shows that the substance of the testimony in this, the second trial, was the same as in the former trial; yet, while on the previous trial he sentenced the defendant to twenty years imprisonment, he now on precisely the same kind of a verdict, has sentenced the defendant to the penitentiary at hard labor for the term of his natural life. The right of the defendant in every criminal action to be tried by a judge free from bias and prejudice is as sacred as is his right to be tried by jurors free from bias and prejudice; and even more so, as the power and influence of the judge are far greater than that of any one juror. " The character of the case on trial affects the question to some extent. Where the penalty may be death, or a long term of imprisonment, the trial judge should listen with more care to the testimony presented to show his bias or prejudice, and a reviewing court will more closely scrutinize the record and give less weight to the presumption in favor of the correctness of the ruling, than where the penalty can only be a fine, or a short imprisonment in the county jail." (12 Kas. 627.) Apply-

ing this rule, this court will·"closely scrutinize" this record, it being a case of imprisonment for life. Look at the testimony, as to what the judge said; his former rulings in the case; his disregard. of decisions of this court; his conversations and statements; his final judgment and sentence. He presided at this trial against the protests and protestations of the defendant, sustained and supported by unanswered testimony. On the same verdict as rendered before, he pronounced a more severe and harsh sentence. If all this does not show prejudice, evidence cannot show it. · If the extra-judicial and extraordinary "statement" of²the judge can outweigh all this, the section of the statute that allows the change for this cause had as well be repealed. But we submit, that the cause specified in § 173 of the criminal code is properly presented in the manner specified in § 177, and that according to the doctrine of *Smith v. The State,* 1 Kas. 365, the showing by the defendant on his application was all that was required.

2. The court erred in not quashing or setting aside the jurors ordered and drawn 2d March 1876. A jury to try a citizen can only be drawn according to law — by the persons in whom the law has vested this high power. · This position is so plain that it would be idle to discuss it. The power to draw a jury from the box is conferred upon certain designated persons. (See § 11, page 535, and § 23, page 538, Gen. Stat.) From this it appears that no deputy-sheriff is intrusted with this delicate power, no more than a school trustee, county surveyor, county attorney, or any other officer not named in the law. Yet the testimony in this case shows that a certain L. M. Tuttle, who was then a deputy-sheriff, participated in the drawing of the jury, and such participation rendered the whole drawing illegal.

3. The court instructed the jury, "that the defendant cannot be excused because *he thought* he was justified; or *thought* that he was in immediate peril; but his belief must have been *well-founded* on reasonable circumstances." * * * "The rule being, you should judge a defendant under the circumstances in which he was placed; *and if a reasonable*

*and judicious man* would have been alike honestly mistaken as to the reality of the danger, then you should excuse him." * * * "In the exercise of his judgment he (defendant) must act *rationally*." * * * "Apply the rules I have given you, and say, if the defendant's life *was then and there in immediate danger* of being taken—if he thought so—and if he had *reasonable grounds* so to think." * * * "According to the testimony, nothing had been done up to this time, upon the part of the deceased, that should warrant the defendant by any means to take his life; and the defendant has testified on the stand that he did not shoot the deceased on account of this scuffle, or any prior difficulty." * * * "Here was time for reflection, deliberation, and premeditation, for the defendant to decide what he would do." * * * "And ask yourselves if it was *necessary* to kill him also." * * * "You should ask yourselves if it was *necessary* to kill Thomas."

In considering the above several charges of the court, let us remember the rule laid down in *Horne v. The State*, 1 Kas. 73: "It was urged in argument that the court had in other parts of the charge given the true rule of law as applicable to this point; but as this was a separate charge it is impossible for us to say that it was not the controlling one with the jury." In the instructions quoted, the proposition is asserted, that defendant could not be excused if he thought he was in immediate peril, but his belief must have been *well*-founded, on reasonable circumstances. We submit that this instruction goes far beyond any doctrine laid down by this court. A point *well*-taken in the law, is an established proposition. A belief *well*-founded, is a belief based upon actual facts, not merely upon reasonable circumstances leading to and producing a belief upon which a fair and rational being would act. But here the court tells the jury it must be *well-founded*, that is, it *must be so*. In *The State v. Horne*, 9 Kas. 129, this court did not say the belief must be well-founded, but only that the "circumstances must not only tend to the belief, but must force the belief on the mind, and the belief

must be reasonable." But in the case at bar, in addition to
all this, the court below instructed the jury that this belief
must be *well*-founded—that is, the foundation for this belief
must in fact exist. No matter what the appearances, how
likely to influence and control a reasonable mind, if in point
of fact the facts upon which the belief is founded do not ex-
ist, no matter how prudently, how carefully, how circum-
spectly, defendant acted, he cannot be held excused. In
other words, if a person warned of the attack of a burglar
upon his house, seeing a person entering through his window
in the night upon which he was threatened, and of which he
was warned, fired and killed a person entering his window,
though it turned out that the person so entering was his son,
or friend, intending no harm, he is yet guilty because his be-
lief was not *well-founded*. This cannot be the law. In *The
State v. Potter*, 13 Kas. 425, this court says—"if the con-
duct of the deceased was sufficient to induce a *reasonable
belief*." And again, in *The State v. Howard*, 14 Kas. 173—
"the rule, that if the defendant has reasonable ground *to ap-
prehend* that he was in imminent danger he is justified in
defending himself." And same case, page 175—"a party
assailed is justified in acting upon the facts as *they appear to
him*, and is *not* judged by the facts as they are." In the in-
struction under discussion the court below told the jury the
converse of this last quotation was the law, that no matter
how the facts appeared to defendant, his belief must be *well-
founded*. We submit that for this instruction the judgment
must be reversed.

Another instruction given by the trial judge is equally
erroneous. He told the jury that "*if a reasonable and judi-
cious man would have been alike mistaken as to the reality of
the danger*," the defendant should be excused. We submit this
is not the law. No man may be convicted of murder sim-
ply because he is not "*a reasonable or a judicious man;*" yet
contained in this proposition is the legal monstrosity, that
where a jury may be convinced the defendant, under the cir-
cumstances surrounding him, honestly, and firmly *believes* he

was in imminent peril, yet because they also believed he was not "*judicious*" he must be convicted of murder.

And again: In another instruction we are told the defendants must act "rationally;" but whether rationally "upon the facts as *they appear* to him," (14 Kas. 187,) or not, we are not told. And in the next instruction, the jury are told to apply the rules theretofore given, and "say" (*who* say?) "*if the defendant's life* was then and there in immediate danger of being taken—if he *thought* so—and if he had *reasonable grounds* so to think." Here are three distinct propositions, all of which must be found in order to excuse the defendant. A party then according to this instruction is not to be judged "*upon the facts as they appear to him.*" The *jury are to say* "if his life was in danger;" and if they fail to find that, no matter what he believed, or what the grounds of his belief, or the reasonableness thereof, he must be convicted.

And we submit further, that the remarks of the judge upon the facts were utterly unwarranted by the testimony in the case, and were calculated to influence the jury against defendant. Again, the remarks that, "*Here was time for reflection, deliberation, and premeditation, for the defendant to decide what he would do*"—is a most flagrant usurpation of the province of the jury. Whether there was time or not for "reflection, deliberation, and premeditation" is purely a question of fact for the jury. No submission of the question to the jury as to whether there was time to reflect, to deliberate, to premeditate, but a bald instruction to the jury that such was the fact. With due respect may we not ask, Have the times of Jeffreys come again?

We quote again from the instructions: "And *ask yourselves* if it *was necessary* to kill him also." "You should ask yourselves if it was *necessary to kill Thomas.*" No proposition is put to the jury in this connection as to whether *the defendant thought it necessary;* as to whether he *thought his life in peril.* No proposition on the basis of "*the facts as they appeared to him.*" But all through the charge, reiterated

4—19 KAS.

and· intensified instructions that the jury must determine whether *they thought it necessary;* and if they did not think so, notwithstanding the solemn conviction of the defendant based upon "the facts as they appeared to *him,*" he must be convicted. We respectfully submit, that there can be found no case in the annals of the criminal jurisprudence of Kansas where more frequent and flagrant violations of the well-known rules of law have been committed, than in this case; and we beg the privilege of suggesting that it is about time that the inferior courts of the state were taught that the decisions of this court are binding on them.

*John Foster,* county-attorney, Saline county, for The State:

1. The first question in the case is, as to what portion of the transcript is legally before this court, and what alleged matters of error can this court consider? The appellant must file a "transcript" in this court from the court below; (§ 284, criminal code;) and such transcript must be properly authenticated; (§ 550, civil code.) The "transcript," or pretended record, brought to this court contains 914 pages. The only authentication in this record, (except as to an information on page 9,) is on page 914, in these words: "That the above and foregoing is a full, true, complete and correct copy of the records and papers in the case of The State of Kansas, plaintiff, v. Barney Bohan, defendant, No. 168, as the same now appears of record and on file in my said office." The record, from page 10 to 79, is what purports to be a bill of exceptions; from page 107 to 114, another; and from page 117 to 714, still another. But what are these papers from pages 1 to 10, and from 75 to 107, and pages 116 and 117? and what *authentication* have they in this record? They are nowhere referred to in either bill of exceptions. Is it claimed that pages 1 to 5 are the notices of appeal? There is no service, or authentication; neither do the papers look like the originals; and they are not papers or records of the case in the court below. Is it claimed· that pages 76 to 107 are copies of the journal of the court below? They are nowhere named as such — not re-

ferred to in either bill of exceptions, nor in any certificate. The appellant carefully designates journal entries on pages 66 to 71. But pages 92 to 103, and 116 and 117, have no *appearance even* of entries of a court journal; but if they had, "there is no authority for their record; and a copy of a paper from a book of records that is not by law authorized to be recorded, is of no validity;" 7 Kas. 177; 1 Kas. 308; 9 Kas. 90; 1 Ohio St. 411. The bill of exceptions (so-called) on the overruling of motion for new trial, has no date except the filing thereof, 5th June 1876. There is no evidence when it was signed, and it cannot be regarded as a part of the record. 1 Ala. 317. This case was tried at the February term 1876, commencing on the 28th of February. The next term thereafter was commenced on the 29th of May. (Ch. 71, laws 1876.)

If the court finds the record in shape to consider the pages above referred to, then I say it appears that the bill of exceptions on overruling the motion for a new trial, so-called, was not presented and signed during the term said case was tried, and is therefore no part of the record. On pages. 90 and 96 it will be seen that the February term of court was extended to the 24th of May, and was in no manner revived or heard of more. But the bill of exceptions was not signed and filed during the trial term. It could not be signed and allowed beyond the term. 1 Kas. 146, 363; 14 Kas. 153; 19 Ohio, 446; 13 Ohio St. 280; 13 Kas. 562; 10 Ohio St. 228. The paper signed by the ex-attorney-general, and attached to the record, is a nullity. It is not within the power of the attorney-general, or any other attorney in the case, to make valid any such record: 10 Kas. 638; 13 Kas. 563. Neither the attorney-general, nor even a judge, can extend the time beyond the term for making a bill of exceptions, or make the same valid if signed thereafter. To sustain the alleged waiver of the ex-attorney-general, is to hold that it is within the power of the attorney-general to make or unmake any bill of exceptions on the part of the state whenever he chooses.

And the so-called *nunc pro tunc* order on pages 104 and 105, if made, is a nullity. 6 Ohio St. 12; Nash's Pl. and Prac. 1035; 2 Sup. Ct. Reporter, 268.

2. What the appellant says in his brief regarding the "peculiarity of this case," the former trial and sentence, and the "passion, excitement and frenzy" of the people of Saline county, will be passed by without discussion, as being not only outside the record, but in nowise warranted by the facts.

Counsel have much to say about the *honorable* acquittal of appellant for the killing of William N. Anderson. But the record in that case is but slightly referred to in this, and I confess entire ignorance of the rule of law by which this court can judge of what the record in that case was, or in what manner, or by what means that verdict of acquittal was obtained. On page 613 of this record it will be seen that one of the jurors in that case of acquittal was prosecuted for corrupt perjury; (and I might add, escaped conviction by a mere technicality in the charge.) I have no anxiety about the judge of the 14th judicial district. He is abundantly able to defend himself. But this court will look in vain through this record for any justification of counsel for the strictures against him. The record here shows that no defendant ever had a fairer or more impartial trial than appellant. Every doubtful question was resolved in his favor.

3. Turning to the record, and the first substantial claim of error is, the refusal of the change of venue on account of the prejudice of the judge. The application came too late, it nowhere appearing that the grounds thereof had come to the knowledge of appellant since the last preceding continuance. An examination of the affidavits submitted on the application do not disclose any prejudice, nor any improper act or word on the part of the trial judge; and there was no error in refusing to change the place of trial. Appellant claims that the life-sentence, on the last trial, as against the twenty-year sentence, on the first trial, is evidence of prejudice. So far from such being the case, the testimony in each

case shows that the sentence should have been for defendant's natural life.

4. Another claim is that there was error in drawing the jury. A special venire of fifty jurors was ordered by the court under § 23 of ch. 54 of general statutes of 1868. By §§ 10 and 11 of said chapter, it will be seen that two justices of the peace of the county, and the sheriff, in person, or by his under-sheriff, shall be notified by the county clerk to be present and witness the drawing, and *if any two of them attend* the clerk shall proceed to draw the jury. And the 19th subdivision of § 1 of ch. 104 of Gen. Stat. of 1868, reads, "The term 'sheriff' may be extended to any person performing the duties of the sheriff, either generally, or in special cases." It is not shown that either the sheriff, or his under-sheriff, attended the drawing. Neither does it appear that the sheriff was not notified, and it is not shown that any unfairness occurred at said drawing. If it can be called an error, it was immaterial and technical, and did not in any manner affect the substantial rights of appellant. A similar objection was raised in *Forsythe v. The State*, 6 Ohio, 21, and was by the court held technical. The court said, "We have never known in this state of an objection of this kind before. The profession, by universal consent, refuse to notice such matters, as they in no way endanger a fair trial."

5. Isolated extracts and sentences are taken from the charge of the court, by the appellant, and complained of here as erroneous. The charge should be read and considered as a whole; and when so read, I submit there is no error therein. I think the charge is distinctly within the rule laid down in *The State v. Horne*, 9 Kas. 130. In that case, the circumstances seem to be similar to the one at bar. And in this case, the court below first states the rules of the law, fully and correctly, and afterward more particularly applies them to the evidence of the case. Let us look at some of the important testimony, showing the circumstances, condition of deceased, position of the parties, etc., appearing in the record. Deceased was drunk with appellant's whisky. He was just

from a state of insensibility caused by the murderous blow of appellant with the iron break-shoe—weak from the loss of blood. The case shows that a bag of wool would have been as dangerous in deceased's hands, as a billiard-cue. The court did well to call the attention of the jury closely to the testimony in this case, and to ask them to apply the rules he had given, and say if there was imminent danger—if appellant thought so, and had reasonable grounds to think so. Observe the different stories of defendant, as to the position of the parties. The appellant was properly convicted on his own testimony. He came in at the front door, and left it open; went to the east side of billiard table; deceased was three or four feet north of him, when he shot him; neither of the Anderson boys had any fire-arms; defendant shot William, who was on the west side of the table, and then shot Thomas as quick as he could turn around and shoot. And yet he says: "The only reason I shot him I made up my mind I *could not get away from him* without his striking me, and if he hit me with it I was a goner." "Did not kill either of them because of the previous difficulty or scuffle." "He said 'Thomas did not strike at him with the billiard-cue;' he said *'he killed him solely and alone because he had that billiard-cue, and for no other reason whatever.'*" I submit that this story of *self-defense* is wanting in the proper legal thickness. 9 Kas. 129; 2 Head (Tenn.) 217. And I "beg the privilege of suggesting that it is about time that" appellant and his counsel were taught that there is punishment for murder.

6. It is claimed that "The appellant in the court below was tried upon a copy of the information." Here is an attempt to raise a question not raised in the court below. The record nowhere shows anything of the kind. If he was so tried, it was on his agreement and consent. The only reference of the kind anywhere, is in the clerk's certificate. The objection and fact must be in the bill of exceptions to be a part of the record, so as to be before this court. (11 Kas. 602.) It is not within the authority of the clerk to put in the record

any matter of the history of the trial which is not in the bill of exceptions above the signature of the trial judge. But the certificate does not show any objection or exception of appellant to being tried on a certified copy, and the case therefore, even on the clerk's certificate, is not within the case of *The State v. Anderson*, 17 Kas. 89. Sec. 275 of the criminal code specifies only five causes for a new trial. Appellant in his motion for a new trial specifies twenty-one; and yet there is not one word about this alleged error of being tried on a certified copy of an information. It is not spoken of in his supposed motion in arrest of judgment. And the whole record shows that this claim of error is an afterthought. 7 Kas. 78.

The opinion of the court was delivered by

HORTON, C. J.: The appellant was convicted of murder in the second degree, at the February term for 1876 of the district court of Saline county, and now appeals to this court. This is the second time the case has been brought here. (*The State v. Bohan*, 15 Kas. 407.)

At the outset, objections are presented to this court by the counsel of the state to the record on file; and the first question in the case is, as to what portion of the record, if any, is legally before this court, and what alleged matters of error can this court properly consider. The term of the court at which the appellant was tried commenced on February 28th, and was extended and kept open until the commencement of the next term thereafter, to-wit, May 29th. Three separate bills of exceptions were signed and filed in the court below, viz., on March 3d, on April 28th, and on June 5th. The bills of exceptions filed March 3d, and April 28th, during the term of the court, were within time, and all matters therein stated can be fully considered. These relate to the action of the court overruling a motion for a change of venue on account of the alleged prejudice of the judge, and the denial of an application of the appellant to set aside the jurors summoned at the term

1. Bills of exception. Settlement.

of the court, because of alleged irregularity in the manner the same were drawn. The alleged errors set forth in the third bill of exceptions, filed on the 5th of June, that day being after the commencement of the May term of the court, and after the February term had expired by law, are not legally here for our determination. "A bill of exceptions filed out of term, is no part of the record." *Brown v. Rhodes*, 1 Kas. 359; *Lownsberry v. Rakestraw*, 14 Kas. 151, 154. The defective record has been attempted to be cured in three ways, viz, by filing an agreement. from the late attorney-general that the bills of exceptions were properly signed and filed, and that the case might be heard upon the merits; by bringing to this court a copy of an agreed statement showing that the bills of exceptions were presented to the court below on May 27th, for allowance; and by an alleged *nunc pro tunc* order of the court of June 5th. None of these attempted curative acts are effective for the purposes intended. This court has decided that the time for reducing exceptions to writing beyond the trial term cannot be extended by a judge, even when consent of counsel has been given, and that we cannot take cognizance of a case not brought here by regular process of law, nor unless in conformity with the statutes regulating the manner of bringing cases into this court. *Gallaher v. Southwood*, 1 Kas. 143; *Cohen v. Trowbridge*, 6 Kas. 385; *Hodgden v. Comm'rs of Ellsworth Co.*, 10 Kas. 637. If counsel could waive in this court manifest irregularities as to the mode and. time of signing and filing bills of exceptions, the preparation and approval of bills of exceptions beyond term-time would become allowable, and the provisions of the statute in this respect be disregarded. As the time for reducing exceptions to writing cannot be extended beyond the trial term, so a bill of exceptions, which has been allowed and filed beyond the trial term, and at the regular term next after that of the trial, cannot be considered here, although counsel formally agree to waive the disregard of the law as to the making of the

*Margin notes: Bill must be settled at trial term.*

*2. Requirements of statute not to be waived.*

said bills of exceptions.  The copy of the agreed statement, showing that the bills of exceptions were presented in due time to the court, and the argument thereon founded, that this court could by mandamus compel its being duly signed, even after the adjournment of the trial term, and hence the signing and filing of said bill of exceptions on June 5th should be held sufficient, does not help the case of the appellant.  An agreed statement cannot be made to supply the place of a bill of exceptions taken in accordance with the statute.  In this case, the agreed statement is neither filed, nor signed; and does not purport to be any part of the journal entry.  It is no part of the record, and must be totally disregarded.  *Patee v. Parkinson,* 18 Kas. 465; *Young v. The State,* 23 Ohio St. 577.  In the absence of this agreed statement, there is nothing in the record to show that the bill of exceptions No. 3 was ever presented to the court prior to the 5th of June.

The so-called order *nunc pro tunc,* made June 5th, and during the May term of the court, does not relieve the difficulty.  If it was intended by such order to have the bills of exceptions which were presented and signed and filed at the regular term next after that of the trial refiled, and marked as if presented, allowed, and filed at the preceding term, such an order was a nullity.  The grounds upon which said order was made simply show that application was made therefor by the attorney of the appellant, and the order does not purport to supply any matter omitted by the clerk from the records of the February term.  Nor does it appear that the clerk had made a different entry from that which was ordered.  *The State v. Jeffors,* 64 Mo. 376.  Indeed, we cannot tell with certainty that such order was intended to apply to bill of exceptions No. 3.  It is certain that the record does not show that said bill was presented at any other time than June 5th.  Under what circumstances a bill of exceptions may, by order of a court at a subsequent term, be made available by a *nunc pro tunc* order, it is not necessary in this case to determine, because the parties, as the rec-

*Nunc pro tunc order, when void.*

ord is presented, are concluded by the record that the said bill of exceptions No. 3 was not presented, signed, or filed during the trial term. The so-called *nunc pro tunc* order makes this manifest. We return to an examination of the bills of exceptions which were properly filed.

I. The first supposed error was the refusal of the court to remove the case to the district court of some county in a different district, on the application and testimony presented by

4. Change of venue; prejudice of judge.

the appellant, when the cause was called for hearing, that the judge of the court was prejudiced. The testimony relied upon to sustain the motion was the affidavits of the appellant, and of his counsel, Messrs. Fenlon, Mohler, and Spivey, the records of a previous trial of this case, and a reversal by the supreme court of the judgment in the case, and also, the proceedings before the said judge under which the appellant was required to give bail in the sum of $15,000 for his appearance to answer the charge contained in the information. We do not think the showing made was sufficient to compel a change of venue. That the testimony hereinafter set forth may be fully understood, we should perhaps state, that at the November term of the court for 1874 the appellant was convicted of the same crime for which he is now under sentence, namely, the murder of Thomas Anderson. Then he was sentenced by the court below to imprisonment in the penitentiary for twenty years. At the July term of this court for 1875, this judgment was reversed, because of the error of the district court admitting the so-called dying declarations of one William N. Anderson, when the homcide of Thomas Anderson was the subject of the charge and investigation. The same judge presided at both trials in the district court. The affidavit of defendant Bohan states: "That the rulings of the court (at the first trial) were adverse; that the court lectured him at the time of sentence, and said defendant was guilty of the offense of which he had been convicted; that he had committed a willful, deliberate and malicious murder; that there was no excuse or justification; that while there might be for killing

William N. Anderson, there was none for killing Thomas; that if the verdict had been in the first degree, he would have sustained it." The affidavit of Thos. P. Fenlon, Esq., states, "That without charging any unfairness upon said judge, he believes he is so prejudiced," etc. J. G. Mohler, Esq., simply swears to the affidavit of Thos. P. Fenlon, on belief. J. G. Spivey, Esq., states, "That whilst he does not charge or intimate any unfairness or unworthy motive, yet he firmly believes the judge has, by his very situation, become so prejudiced," etc.; and "that he regarded the language of the judge at time of sentence, harsh and severe; and that the judge expressed convictions of appellant's guilt in the second degree, and also stated, as he recollects, that if the jury had found him guilty in the first degree he would have sustained it."

In answer to the affidavits and testimony of the appellant, on the motion, the trial judge filed a statement, which contains among other things, the following: "I am quite sure I did not use the language imputed to me in the petition and affidavit of defendant, to-wit, 'that he had committed a willful, deliberate and malicious murder.' I discussed the testimony somewhat in pronouncing judgment, and said there was some that would tend to show deliberation and premeditation, (quoting it,) and that this was the charge and the theory of the prosecution, and that the facts were such, as shown by the testimony, on these points, 'that if the jury had returned a verdict of murder in the first degree I should not have disturbed it'— coming nearer to the language used in the affidavit of John G. Spivey. In deciding upon the question of bail, I did not discuss the case, or express or intimate any opinion on it in any way, either of my own, or as to what the testimony had shown. And in pronouncing judgment, I did not in any way express my own opinion on the case, but only discussed the testimony adduced on the trial. The affidavits do not show any statements or acts of mine out of court, but as far as facts are stated therein (eliminating conclusions of law, and fact, and opinions, which have but little weight,) they show only an expression or words

gathered now and then from the whole proceeding of the trial and judgment, at which I am compelled to preside and act; and when these words are quoted they are disjointed from their legitimate connection, which leaves their construction, meaning, and weight not fully understood."

From the testimony we cannot say that the evidence shows any prejudice toward the appellant by the trial judge; much less can we say that prejudice *clearly* appears. The law provides, that "when the defendant appears for judgment he must be informed by the court of the verdict of the jury, and asked whether he has any legal cause to show why judgment should not be pronounced against him;" and in answer to the inquiry last stated, the defendant often replies that he is innocent, and has been wrongfully convicted. In answer, the trial judge frequently comments upon the trial, the manner the party has been defended, and the evidence introduced in the case, and frequently remarks very similar to those stated by the trial judge to have been spoken by him on the occasion of the first sentence of the appellant, are made use of. We are aware of no authorities which go to the extent that statements, thus made, amount to prejudice or ill-will. To thus hold in this case, would lead to absurd consequences. No authority is cited by counsel for appellant to sustain the proposition that these comments upon the evidence are sufficient to establish prejudice.

Neither can the adverse ruling of the trial judge, on the first trial, which was afterward corrected in this court, be held to authorize a change of venue. Errors of judgment, do not amount to prejudice or ill-will on the part of a judge. The theory of our judicial system is, that courts of *nisi prius* may commit errors of judgment in matter of law, which are to be reviewed by courts of last resort; but such errors have never been held equivalent to prejudice. *Burk v. Mayall*, 10 Minn. 287. Counsel for appellant contend however, that the cause for a change of venue, specified in section 173 of the criminal code (Gen. Stat. 847,) is properly presented in the manner required by section 177 of same code, and that accord-

ing to the doctrine of *Smith v. The State*, 1 Kas. 365, the showing by the defendant on his application was all that was necessary. The argument is not good. The decision cited construes section 155 of the criminal code of 1862, (Comp. Laws, 259,) among others; and said section relating to change of venue did not require the defendant to prove to the satisfaction of the court the facts set forth in the application for the removal, but merely to support the truth of the allegations by the affidavit of the defendant, or some credible disinterested person. The law has since been changed. Section 177 of our present criminal code, (Gen. Stat. 1868, p. 848,) which answers to section 155 of the criminal code of 1862, prescribes that, "In the petition for a change of venue, the applicant shall set forth the facts upon which the application is made, and the truth of the allegations in the petition *shall be made to appear by affidavits to the satisfaction of the court.*" Sections 174 to 177, criminal code of 1868, apply to cases where the application is based upon the prejudice of the inhabitants. *City of Emporia v. Volmer*, 12 Kas. 622. In concluding this branch of the case we quote from the opinion of Mr. Justice Brewer in the case of the *City of Emporia v. Volmer*, supra: "If it were to be determined by simply the affidavit of the defendant, there would be almost numberless changes of venue. Every defendant closely pressed, would seek delay in this manner. A change of venue is a wrong to the public, unless the necessities of justice to the defendant require it. It works delay. It causes expense. It endangers a prosecution. A defendant is easily persuaded of the prejudice of the judge. Adverse rulings convince him of the fact. It seems to us therefore, that this is the true rule: that such facts and circumstances must be proved, by affidavits, or other extrinsic testimony, as *clearly* show that there exists a prejudice on the part of the judge toward the defendant; and unless this prejudice thus *clearly* appears, a reviewing court will sustain an overruling of the application, on the ground that the judge must have been personally conscious of the falsity or non-existence of the grounds alleged. It is not

sufficient that a *prima facie* case only be shown, such a case as would require the sustaining of a challenge to a juror. It must be strong enough to overthrow the presumption in favor of the trial judge's integrity, and of the clearness of his perceptions."

II. The second error alleged in the exceptions filed in time is, that the court erred in not discharging or setting aside the jurors ordered and drawn on the second day of March 1876. The complaint is, that one L. M. Tuttle, a deputy-sheriff, attended at the county clerk's office to witness the drawing at the date named, in place of the sheriff of the county, or the under-sheriff of the county, as provided by sec. 11, Gen. Stat. 1868, p. 535. The alleged error is extremely technical; but as the law was fully complied with, we see no material error. By sections 10 and 11, (Gen. Stat. 535,) it will be seen that two justices of the peace of the county, and the sheriff in person, or by his under-sheriff, shall be notified by the county clerk to be present and witness the drawing, and if any two of them attend, the clerk shall proceed to draw the jury. The record shows that E. L. Norton and R. H. Bishop, two justices of the peace of said Saline county, did attend, as required by law, in answer to the notifications, and on the day of the drawing signed a sufficient certificate to the effect that on the 2d of March 1876 the jury were drawn. It is not shown that either the sheriff or his under-sheriff, attended the drawing. Neither does it appear that the sheriff was not notified; and it is not claimed that any other irregularity occurred except that said deputy-sheriff was present at the drawing, and together with the county clerk and the two justices of the peace signed the certificate of the names of the persons drawn, and the date thereof. The county clerk testified on the motion, that at the drawing of the jurors, he, as county clerk, alone drew the names of the jury from the box, and the other persons, whose names were attached to the certificate, were present and witnessed the drawing." As two of the officers required by the law to attend and witness the drawing were present, with the

*5. Drawing jurors; presence of deputy-sheriff.*

county clerk, and as the law compels the clerk to proceed (when two are present) to draw the jurors, the mere fact that a deputy-sheriff was also in attendance, and afterward signed with the others a certificate of such drawing, in no way renders the drawing void. The court rightfully over-ruled the motion.

III. Notwithstanding the invalidity of the bill of exceptions filed on June 5th, and beyond the trial term of the court, we have examined the entire testimony, and record, with care; and we cannot say that the judgment rendered was erroneous. The evidence very strongly sustains the verdict. Much complaint is made concerning the direction of the jury; but a review of all the instructions shows very clearly that the court, upon the question of self-defense, adopted the decisions of this court, and fully instructed the jury, that all the law exacts is, that there shall be a reasonable apprehension of imminent danger, and that of the reasonableness of this apprehension the jury are to be the judges. "There must not only be reasonable ground to believe such a design exists, but the person to execute the design must be accompanied by some attempt to execute it, or the person must at least be in an apparent situation to do so, and so induces a reasonable belief that he intends to do it immediately. Where the justification is based upon recent threats, and circumstances which would tend to lead the defendant to believe that his life was in imminent danger, the threats and circumstances must not only tend to lead to the belief, but they must force the belief upon the mind, and then the belief must be reasonable, and such as reasonable men act on." *The State v. Horne,* 9 Kas. 19; *The State v. Howard,* 14 Kas. 173. There are some expressions in the charge of the court, which are copied in the brief of counsel for the appellant, that, detached and isolated, as presented to us, seem proper subjects of criticism. But all of this arises from snatching a single phrase from its proper connections, and giving it a special instead of the general application it had. Taking the context, we find no just ground

6. Homicide; self-defense; instructions.

of complaint. Instructions are to be considered and construed together, as a whole; and if not erroneous when so construed, no one of them will be held to be erroneous. *The State v. Dickson*, 6 Kas. 209.

IV. Complaint is also alleged in the so-called bill of exceptions No. 3, that the court erred in overruling the motion and showing for a new trial, because it was alleged that W. S. Warner, one of the jurors, had formed and expressed opinions as to the guilt of the appellant before the trial of the cause, and of which the appellant had no knowledge until after the verdict. This charge was fully and carefully investigated by the trial judge, and mostly upon oral testimony. The juror satisfactorily denied all statements affecting the alleged incompetency. A large number of witnesses were introduced to show that the parties attacking the competency of said Warner as a juror were unworthy of belief, and that their reputations for truth and veracity were bad. Others were called to support the characters of these parties. Under the circumstances, without deciding whether, under our practice, the alleged statements of Warner, if proved, would be a ground for a new trial, when the objection is taken for the first time after the trial, upon affidavits showing disqualification, we are of the opinion we cannot now adjudge the action of the court below erroneous in this respect. The well-settled rule of this court should prevail in this matter, as in others, that where the trial court has had the opportunity of hearing the testimony from the witnesses in person, and of seeing them as they uttered the same, and has thereon rendered a decision, this court will not hold such decision erroneous as to questions of fact, unless it is *clearly* apparent that the decision or finding is wholly unsupported by evidence.

V. Additional error is alleged upon a statement incorporated in the record by the district clerk, to the effect that the appellant was tried in the court below upon a *copy* of the information; this ground of error is not well taken. The record does not sustain the allegation. The certificate of the

clerk as to what took place at a trial must be disregarded. The clerk has no such authority. If such was the fact, it should have been properly presented. This claim was not made upon the trial, and this alleged error nowhere appears in any of the numerous motions made in the court below. It is raised in this court in the case for the first time. A reading of all the record would seem to show that the appellant was tried upon the original information filed against him; but the clerk, of his own motion, interpolates in the record his statement that such was not the case. This statement goes for naught. Bills of exceptions are not thus made, and matters of this character cannot thus be brought to this court for review.

Having examined all the causes for which it is claimed that a new trial should be granted, and having found no error in them, the judgment is affirmed.

All the Justices concurring.