# SUPREME COURT,

## STATE OF KANSAS.

## JULY TERM, 1886.

PRESENT:

HON. ALBERT H. HORTON, CHIEF JUSTICE.
HON. DANIEL M. VALENTINE, } ASSOCIATE JUSTICES.
HON. WILLIAM A. JOHNSTON, }

THE STATE OF KANSAS V. WILLIAM BALDWIN.

1. CRIMINAL CASE; *Oath of Jury; Record.* It is highly important and necessary that the oath should be administered to the jury in a criminal case with due solemnity, in the presence of the prisoner and before the court, and substantially in the manner prescribed by law; but it is no part of the duty of the clerk to place on the record the formulary of words in which the oath is couched. He has performed his duty in that respect when he enters the fact that the jury were duly sworn, and when that is done the presumption will be that the oath was correctly administered.

2. —— *Oath of Jury; Recital in Record.* Where the recital in the judgment entry is that the parties appeared "and issue being joined upon a plea of not guilty, came a jury, [naming them,] twelve good and lawful men, having the qualifications of jurors, who, being duly elected, tried and sworn well and truly to try the issues joined herein," it cannot be regarded as an attempt to set out in full the oath actually administered, but should rather be considered as a statement by the clerk that the jury had been sworn and acted under oath; and the fact that there is no recital, that the jury were required to give a true verdict according to the law and the evidence, is not a ground for reversal.

3. —— *Irregularity in Form of Oath; Practice.* Where a party desires to avail himself of irregularity in administering the oath to the jury, the attention of the court should be called to it at the time the oath is taken. A party cannot sit silently by and take the chances

of acquittal, and subsequently, when convicted, make objections to irregularity in the form of the oath. .

4. ───── *Irregularity; Practice.* Not only must the objection be made when the irregularity is committed, but the form in which the oath is taken, as well as the objection, should be incorporated in the bill of exceptions, in order that this court may see whether or not it is sufficient.

5. SUICIDE, *Evidence to Repel Theory of.* Where there are some circumstances which suggest that a person charged to have been murdered committed suicide, it is competent for the prosecution, for the purpose of repelling the theory of suicide, to show by an ordinary witness, who was intimate with the deceased, and was with her the evening before her death, that she was then in good spirits and appeared to be happy.

6. OPINIONS, *What Facts may be Shown by.* Facts which are made up of a great variety of circumstances and a combination of appearances that cannot be fully described, may be shown by the opinion of ordinary witnesses whose observation is such as to justify it. In this category may be placed matters involving magnitude or quantities, portions of time, space, motion, gravitation, value, and such as relate to the condition or appearance of persons and things. On the same principle, the emotions or feelings of persons, such as grief, joy, despondency, anger, fear, and excitement, may be likewise shown.

7. ───── *Conduct of Prisoner.* The demeanor of one charged with crime, at or near the time of its commission, or of his arrest for the same, may always be shown; and the testimony of the officer who subpenaed and took the defendant before the coroner's jury, that "he was very nervous and showed a great deal of fear," was admissible.

8. ───── *Grief of Prisoner; Limit of Inquiry.* Whether the defendant manifested evidence of grief on account of his sister's death, was a proper inquiry of the state. Such inquiry, however, must be confined to a reasonable time after the death or its discovery; and where the inquiry relating to his conduct covered a period of four months thereafter, it is held to be an unreasonable time, but under the testimony and circumstances of the case it was not prejudicial error.

9. ───── *Testimony of Experts.* A panel had been cut and taken from the outside door of the house where the offense was committed; and when the defendant, who was a carpenter, was arrested, a knife was found on his person. Witnesses who were skilled workers in wood were called, and testified that the panel had been cut out with a knife, and that the blade of defendant's knife exactly fitted the place where the panel had been pierced; that it had been cut from the outside by one skilled in the use of tools, and was evidently taken out by one who understood the construction of a door. *Held,* That

The State v. Baldwin.

the manner in which the cutting was done, and the effect of the tools upon the wood, involve skill and experience to judge of, and are not within common experience; and it was proper that the jury should be aided by the experience of experts.

10. ———— *Inadmissible Evidence.* A check drawn by the defendant's mother in favor of the deceased for a sum of money, of which the defendant had no knowledge, was not admissible in evidence; but as it had no bearing upon the defendant directly or remotely, it could not affect him injuriously.

11. LETTER—*Admissible Evidence.* A letter written by the deceased immediately preceding her death, which showed that she was in a healthful condition of body and mind, and contained nothing prejudicial to the defendant, was admissible in evidence to show the condition of her health and mind, and to repel the theory that she committed suicide.

12. CROSS-EXAMINATION; *Proper Question.* Where the defendant produced a witness who, with a view of showing the conscious innocence of the defendant, testified what his conduct and appearance were soon after the death of his sister, it was proper to inquire on cross-examination, if the witness had not stated at the preliminary examination that the defendant impressed him at once as being guilty of the murder.

13. WITNESS; *Inspecting Memorandum.* A witness may be permitted to refresh his memory from a writing or memorandum made by himself shortly after the occurrence of the fact to which it relates; but it is only when the memory needs assistance that resort may be had to these aids, and if the witness has an independent recollection of the facts inquired about, there is no necessity nor propriety in his inspecting any writing or memorandum.

14. IMPEACHMENT; *Insufficient Foundation.* Where, with a view of impeaching a witness, he is asked if he did not make a certain statement on a previous examination, and he replies that "it amounts to about the same thing," he thereby practically admits the making of the statement, and his answer is insufficient as a foundation for impeachment.

15. EVIDENCE; *Medical and Scientific Books.* Medical and scientific books cannot be admitted in evidence to prove the declarations or opinions which they contain; but a witness who is a medical expert is not confined wholly to his personal experience in the treatment of men, but may give his opinions formed in part from the reading of books prepared by persons of acknowledged ability; and it is not improper for him to give the source of his opinion, and that all the writers and authorities on the subject, so far as he knows, support him in that opinion.

16. MURDER BY POISON; *Malice; Needless Instruction.* The court charged

the jury that to convict the defendant, it must be shown that he purposely took the life of the deceased by administering poison to her. A murder that is committed by means of poison involves and presupposes the element of malice, premeditation, and deliberation, and hence it was needless for the court to state that they are prerequisites to a conviction.

17. INSTRUCTION; *Meaning of Words.* The court takes notice of the meaning and force of the ordinary words of our language, and also of technical words where their meaning is well settled by common usage, and the court may, where it is necessary, define and explain them to the jury. It was therefore not error for the court to instruct the jury as to the ordinary meaning and definition of anæsthetic, chloroform, and poison, as given by Webster's Dictionary and other works of standard authority, where it appears that the definitions are correct in every respect.

18. ———— *Reviewing Facts by Court.* The court may review and present the facts in a criminal case, provided the jury are informed that they are the exclusive judges of every question of fact; and hence where the definitions and comments of the court upon words that are technical and peculiar to a science are in keeping with the testimony given regarding such words, there is no error.

19. CHLOROFORM — *Poison — Instruction.* As the legislature has published and declared chloroform to be a virulent poison, by a law which all are presumed to know, it was not error for the court to say to the jury that, "in common parlance, chloroform is classed among the poisons," when he couples with the statement the direction that it was still necessary for the jury to find from the evidence that chloroform is a poison, before the defendant could be convicted.

20. MOTIVE — *Instruction.* The defendant cannot be heard to complain of an instruction requested by himself; and with respect to motive, it was not error for the court to instruct that defendant should be judged by the information upon which he acted, rather than upon the accuracy of his information.

21. NEW TRIAL — *Findings of Court.* The finding of the court upon the question of fact presented in a motion for a new trial, which is made upon oral and conflicting testimony, is as conclusive upon this court as the verdict of a jury founded on like testimony, and which has received the approval of the trial court.

22. ———— A judgment of the district court should not be reversed except for prejudicial error.

23. EVIDENCE *Sustains Verdict.* The evidence in the record examined, and held to be sufficient to sustain a verdict finding the defendant guilty of committing murder by means of poison.

## Appeal from Atchison District Court.

PROSECUTION for murder. Trial at the November Term, 1885. The jury found the defendant, *William Baldwin*, guilty of murder in the first degree as charged in the first count of the information. The court overruled the defendant's motions for a new trial and in arrest of judgment, and on January 11, 1886, sentenced the defendant in accordance with the verdict. He appeals. The opinion contains a sufficient statement of the case.

*C. F. Cochran,* and *Everest & Waggener,* for appellant.

*W. D. Gilbert,* county attorney, for The State.

The opinion of the court was delivered by

JOHNSTON, J.: William Baldwin was informed against, tried and convicted of the crime of murdering his sister, Mary Baldwin. The information consists of two counts, in the first of which it is charged that the defendant, on or about the 8th day of July, 1885, administered to Mary Baldwin an anæsthetic, to wit, chloroform, which is alleged to be a deadly poison, with the felonious intent to kill and murder her. In the second count the charge is, that the death of Mary Baldwin was occasioned by the defendant pressing a pillow on, over and against her mouth, nose and face, thereby preventing respiration and causing death. The jury found him guilty of murder in the first degree under the first count of the information, and he was thereupon sentenced and adjudged to suffer death. From that sentence and judgment he appeals to this court. In the elaborate brief filed by his counsel there are forty-seven assignments of error, many of which were not referred to in the oral argument, and some of which are unimportant. The alleged errors have all been examined, and such of them as are deemed worthy of notice will be considered and disposed of in their order of presentation here.

I. The first assignment is that the jury were not duly sworn. In the journal entry of the proceedings at the opening of the

trial, it is stated that the parties appeared, and issue being joined upon a plea of not guilty, a jury came, naming them, "twelve good and lawful men, having the qualifications of jurors, who, being duly elected, tried and sworn well and truly to try the issue joined herein, pending the introduction of testimony, the court adjourned until to-morrow morning," etc. The exact form of the oath to be taken by the jury is not laid down in the statute, but with respect to administering the oath, it is provided that "the jury shall be sworn to well and truly try the matters submitted to them in the case in hearing, and a true verdict give according to the law and the evidence." (Crim. Code, § 208; Civil Code, § 274.) The contention of the defendant is, that the record undertakes to set out the oath actually administered to the jury, and that as it omitted the essential part of requiring that they should a true verdict give according to the law and the evidence, the judgment should be reversed. It is highly important and necessary that the oath should be administered with due solemnity, in the presence of the prisoner and before the court substantially in the manner prescribed by law. It may also be conceded that the record should show that the jury were sworn, and when the record does purport to set out in full the form of the oath upon which the verdict is based, it must be in substantial compliance with law; otherwise the conviction cannot stand. The assumption by counsel that the oath as actually administered is set out in full in the record, it seems to us is unwarranted. What is stated in the record is but a recital by the clerk of the fact that the jury were sworn. The swearing was of course done orally in open court, and it is no part of the duty of the clerk to place on the record the exact formulary of words in which the oath was couched. He has performed his duty in that respect when he enters the fact that the jury were duly sworn, and when that is done the presumption will be that the oath was correctly administered. The method of examining the jurors as to their qualifications, or whether the oath was taken by them while standing with uplifted hands, according to the universal practice in the state,

or otherwise, is not stated. In making mention of the impaneling and swearing of the jury, there is no description of the parties between whom the jury are to decide; nor indeed are there any of the formal parts of an oath stated. The statement made is only a recital of a past occurrence; and it is manifest that there was no intention or attempt of the clerk to give a detailed account of the manner of impaneling the jury, or to set out the oath *in hæc verba.*

It may be observed that in the form of the verdict returned, and which was prepared and presented to the jury by the trial judge, it was stated that the jury were duly impaneled and *sworn.* Counsel for defendant have called our attention to the case of *Johnson v. The State,* 47 Ala. 62, where the record entry of the swearing of the jury is substantially what it is in the present case. The court there treated the recital as stating the form and substance of the oath administered, and held that the omission of the injunction to render a true verdict according to the law and the testimony was fatal. The question was before the same court in a later case, and the ruling in *Johnson v. The State,* supra, which had been followed in some other cases, was expressly overruled. (*Mitchell v. The State,* 58 Ala. 417.) In the latter case the court held that recitals in the record relative to the swearing of the jury, like the one found in the record before us, are not to be regarded as an attempt to set out the oath actually administered, but should rather be considered as a statement of the fact that the jury had been sworn and acted under oath. This view seems to us to be reasonable and right; and it is one which has been generally adopted. (*Boose v. The State,* 10 Ohio St. 575; *Dyson v. The State,* 26 Miss. 362; *Bartlett v. The State,* 28 Ohio St. 669; *Atkins v. The State,* 60 Ala. 45; Thompson and Merriam on Juries, § 299, and note.) A still more conclusive answer on this point is, that no objection was made to the form of the oath when it was administered, or at any other time prior to its presentation in this court. If there was any irregularity in this respect it should, and probably would, have been objected to at the time it occurred. It is

quite unlikely that there was any departure from the form of the oath so well understood, and which is in universal use in all of the courts of the state; but if the form of the oath was defective the attention of the court should have been called to it at the time the oath was taken, so that it might have been corrected. A party cannot sit silently by and take the chances of acquittal, and subsequently, when convicted, make objections to an irregularity in the form of the oath. Not only must the objection be made when the irregularity is committed, but the form in which the oath was taken, as well as the objection, should be incorporated into the bill of exceptions, in order that this court may see whether or not it is sufficient. This was not done.

II. The assignments of error from the third to the twentieth inclusive are based on the ruling of the court in the admission of testimony. The first six of these objections relate to the testimony of Albert H. Lewis. This witness was an intimate acquaintance of the Baldwin family, which consisted of the deceased, the appellant, and their mother, M. A. Baldwin. J. W. Baldwin, the father of Mary and William Baldwin, died in November, 1884, leaving an estate of considerable value, and the widow, M. A. Baldwin, was appointed administratrix of the estate. Lewis was a frequent visitor at the Baldwin homestead, was engaged to be married to Mary, and he was the confidential adviser of her mother in the management of the estate, and assisted in investing the money of the estate. In the course of the trial, Lewis was asked to state whether he had been frequently called on by Mrs. Baldwin, after the death of her husband, to counsel about the estate, and also whether the appellant was ever called on at these times to counsel with them. These questions, although not very material, were competent for the purpose of eliciting the relations existing among the members of the Baldwin family. The objection especially urged against the admission of the testimony is, that the defendant had no knowledge that his mother counseled with Lewis about the estate, and that no such consultation was had with Lewis in the presence of the

defendant. This claim is not borne out by the evidence in the record. In the answer to the question objected to it is stated that in one instance the defendant was called in to confer with Lewis and his mother in regard to the investment of funds belonging to the estate. On another occasion the appellant accompanied Lewis to inspect security that was offered upon a loan negotiated by Lewis for the estate; and indeed the conduct of the appellant in frequently applying for money from his mother through Lewis, leaves no doubt about the question. The further evidence relating to Lewis transacting business at the banks for Mrs. Baldwin in reference to deposits, as well as that showing that money was drawn from the banks upon checks signed by Mary and her mother, is unobjectionable, and cannot in any way be considered prejudicial to the defendant.

III. About two weeks prior to Mary's death, her mother, who was in ill-health, went to an infirmary in Iowa for medical treatment, where she remained until notice was received of her daughter's death. The only occupants of the house during her absence were Mary and a male lodger. Occasionally some of her lady friends would stay over night with her, but on the night of her death she was alone. The evening prior to her death she spent in the company of Lewis, who remained with her until about ten o'clock. On the next evening her dead body was discovered in her bed-room. She was found lying in bed, robed in a night dress, with a pillow lying upon her face, and a small chloroform bottle was found near by her in the bed, upon which there was a poison label. With the evident purpose of repelling the theory of suicide, Lewis was asked by the state whether, on the evening prior to Mary's death, there was anything in her appearance that made him believe she was in grief or was dissatisfied. He stated that there was not, but that she was in good spirits, and when he left her she seemed to be happy. It is claimed that this testimony is incompetent, because it is but an opinion formed from her appearance. It is a well-known general rule that witnesses are not to give their individual

opinions, but are to state the facts, from which the jury are to form their opinions. There are, however, exceptions to this rule, which are as well defined as the rule itself. Whenever the question at issue is outside of the knowledge and experience of ordinary jurors, or where it so far partakes of the nature of science or trade as to require special and peculiar knowledge or skill in order to arrive at a correct conclusion, the opinions of experts are admissible. There is another equally well recognized exception, founded in necessity, under which the opinions of ordinary witnesses are received. Facts which are made up of a great variety of circumstances and a combination of appearances, which, from the infirmity of language, cannot be properly described, may be shown by witnesses who observed them; and where their observation is such as to justify it, they may state the conclusions of their own minds. In this category may be placed matters involving magnitude or quantities, portions of time, space, motion, gravitation, value, and such as relate to the condition or appearance of persons and things. (*City of Parsons v. Lindsay*, 26 Kas. 426; *The State v. Folwell*, 14 id. 105.) On the same principle, the emotions or feelings of persons, such as grief, joy, hope, despondency, anger, fear, and excitement, may be likewise shown; and hence the testimony objected to was properly admitted. (Lawson's Expert and Opinion Evidence, rule 64; 2 Best on Ev., § 517.) Lewis was intimately acquainted with the deceased. He had visited her almost daily for many months, and was with her a few hours before her death. The relation in which he stood to her, and his opportunity to observe her, certainly enabled him to read her conduct, gesture, tone, and expression of eye and face, and to form an intelligent opinion with respect to whether she was depressed or in grief. By her appearance he could determine her condition of mind with almost unerring accuracy, and yet how futile it would have been for him to attempt to portray to the jury the facial expression, the looks of the eye, or the inflection of the voice, which led him to believe that she was in a happy frame of mind. This species of evidence is

admitted because it is the best which, in the nature of things, can be obtained, the value of which depends of course upon the capability of the witnesses, and the means that they had of forming an opinion, which may be ascertained and thoroughly tested upon cross-examination. What has been said here disposes of the objection urged against the testimony of Frank Price, the city marshal, who was present at the Baldwin residence on the evening that Mary's death was discovered, and who attended upon the coroner's jury that was impaneled to inquire into the cause of her death. He stated, in response to inquiries made by the state, that the defendant "was very nervous and showed a great deal of fear" when he was subpenaed and taken as a witness before the coroner's jury. The conduct of one charged with crime about the time of its commission, or at the time of his arrest, may always be shown; and under the rule which we have been considering, the opinion of the witness that the defendant appeared to be in fear at that time was admissible. (*Brownell v. People*, 38 Mich. 732.)

IV. Objection is also made to the testimony of John Donahue, the jailer who had charge of the defendant from the time of his arrest, which was made about ten days after the crime was discovered. He was asked what was the general demeanor and conduct of the prisoner during the time he had him in charge, as to grief and sorrow, or whether the defendant manifested any evidence of grief or sorrow. He answered that the defendant was unruly and quarrelsome, and that at times he was wrestling, scuffling and boxing, and at other times was fussing and fighting and making threats. This inquiry was evidently not made with a view to initiate an inquiry into the general character of the defendant, nor to show that he had committed other offenses, and therefore many of the authorities cited by counsel are inapplicable. The manifest purpose of the testimony was to show that he was apathetic regarding his sister's death, and did not evince that feeling and sensibility to be expected of a brother. As has been said, the conduct and demeanor of the prisoner at

the time of his arrest, or soon after the commission of the crime, may go to the jury as evidence of a guilty mind, and so far as the testimony was confined to a reasonable time after the discovery of the crime and his arrest, it was certainly admissible. (*Greenfield v. The People*, 85 N. Y. 75.) We are inclined to the opinion that the inquiry was too general, and extended over too great a period, as the defendant was in charge of the witness from the time of the arrest to the time of the trial, a period of about four months, and for this reason as well as that the testimony was somewhat unresponsive and irrelevant, we think the motion to strike it out ought to have been sustained.   However, the testimony shows that the defendant did not manifest evidence of grief at the loss of his sister at any time while he was in jail, and was not much affected by her unnatural death; and hence the fact that the inquiry concerning his demeanor covered too much time, could not have injured him.   And when we consider that the charge against which he was defending, and of which he was convicted, was that of poisoning his sister, the somewhat irrelevant statement of the witness that he was fussing and fighting while confined in jail did not operate, we think, to prejudice him in the minds of the jury.

V. There was no error, we think, in admitting the testimony of James and Warstall. They were carpenters, with large experience as pattern makers and workers in wood. It seems that the parties who discovered the dead body of Mary Baldwin, at the same time found that a panel of an outside door of the Baldwin house had been cut and taken out. It appeared that the defendant was a carpenter also, and a knife was found on his person, which, with the door and panel, were brought into court. These witnesses stated that the panel, which was one-sixteenth of an inch in thickness, had been cut out with a knife, and could have been cut by the defendant's knife; that the blade of the knife exactly fitted the place where the panel had been pierced; that the cutting was done by a person skilled in the use of tools, and after explaining the peculiar manner in which the door was constructed, stated that

the panel was evidently taken out by one who understood the construction of a door, and also that it was cut from the outside. The evidence offered to sustain the conviction in this case is wholly circumstantial, and the testimony of experts was more than ordinarily important. These men were skilled workers in wood, and their experience enabled them to judge from the marks and impressions left upon the door by the tool used, whether it had been cut with a knife, chisel, or saw; whether it had been cut by a thick or a thin-bladed knife; whether it had been cut by one accustomed to the use of tools; and the marks or traces made upon the wood by the knife would indicate to the trained eye whether it had been cut from the outside or the inside. The manner in which the cutting was done, and the effect of the tools upon the wood, involve skill and experience to judge of, and are not within common experience; and it was therefore proper that the jury should be aided by the experience of these experts. (*Commonwealth v. Choate,* 105 Mass. 451.)

VI. A check drawn by Mrs. Baldwin in favor of the deceased was offered in evidence, of which the following is a copy:

"ATCHISON, July 7, 1885.—The Atchison Savings Bank pay to Mary Baldwin or order five hundred and fifty dollars ($550).    MRS. M. A. BALDWIN."

This was admitted for the purpose of showing the dealings among the members of the Baldwin family. The consideration of the check, or the purpose of Mrs. Baldwin in making it, is not disclosed in the testimony. It is not shown that the defendant had any knowledge of its existence prior to the time it was offered in evidence, or was in any way concerned with it. It was written on the blank check of a bank at Bloomfield, Iowa, where Mrs. Baldwin was staying, was written by her, and these facts, together with the date of the check, show that it could not have even reached Atchison prior to Mary's death. The check was not referred to in the letters of the defendant or of the deceased, nor was it identified by any of the other testimony; and as it was not shown to have been in any

way connected with the defendant, it was incompetent. But although erroneously admitted, it had no bearing upon the defendant directly or remotely, and we fail to see how its admission could have affected him injuriously. It was therefore an unimportant and harmless error; and the legislature has stated that errors and defects that are unimportant, and which do not affect the substantial rights of the appellant in criminal cases, furnish no grounds for a reversal. (Crim. Code, 293.)

VII. A letter of the deceased to her mother, written just before her death, and postmarked afterward, clearly showed that she was then in a healthful condition of body and mind. She described the occurrences in the town and the affairs at home, spoke hopefully of the future, and referred with evident pleasure to the constant attention and devotion of him to whom she was betrothed. The letter indicates cheerfulness and contentment, and contains nothing prejudicial to the defendant. It disclosed her condition of health and mind, which were wholly inconsistent with the theory of suicide, and for this reason and purpose it was admissible. (Rosc. Crim. Ev. 30; 3 Greenl. Ev., § 135, and note.) Her letter written in 1882, long prior to her father's death, was too remote. It was not claimed by the state that other than friendly relations existed between the deceased and the defendant before his father's death, and therefore it was not error to exclude the letter.

VIII. The objections urged to the question asked the clergyman Mulford on cross-examination are not good. After stating in his examination in chief what the conduct and appearance of the defendant were soon after the death of his sister, with a view of showing the conscious innocence of the defendant, it was proper to inquire if the witness had not stated before the coroner's jury that the defendant impressed him at once as being guilty of the murder. It was allowable on cross-examination, and besides, if denied, it afforded a foundation for impeaching the witness. He gave a qualified answer, saying that he would not deny or affirm that he had so stated, but did deny stating that he had a thorough im-

pression of his guilt, and he added that the appearance of the defendant was that of painful surprise that anyone should suspect him of the offense. We cannot agree that the ruling was erroneous.

IX. Complaint is made of the ruling of the court in sustaining objections to the testimony of R. B. Spitler. He is a stenographer, who was in the employ of the defendant's attorneys at the time of the preliminary examination, and took a stenographic report of the evidence then given. He transcribed the report and then destroyed his original notes. At the trial he was placed on the stand with his transcript in hand, and, with a view of impeaching the witnesses Price, James, and Warstall, he was requested to refresh his recollection from the transcript, and give the testimony of those witnesses on certain matters, when the objection of the state was sustained. That a witness may be permitted to refresh his memory from a writing or memorandum made by himself shortly after the occurrence of the fact to which it relates, is unquestioned. The writing and memorandum are used, not as evidence, but to aid the memory. As the facts must finally be stated by the witness from personal knowledge and recollection, if the witness has an independent recollection of the facts inquired about there is no necessity or propriety in inspecting any notes or writing. It is only when the memory needs assistance that resort may be had to these aids. Now Spitler had an independent recollection of what was said by James and Warstall, and repeated it before the jury, and therefore there can be no objection to the ruling of the court so far as it related to the testimony of those witnesses. So far as it related to the testimony of Price, Spitler was not asked whether he had an independent recollection of what was said by him, and hence the necessity of resorting to the transcript was not apparent. It appears, however, that there was another sufficient reason for excluding the testimony. It was intended as impeaching evidence, which can only be used where a proper foundation has been laid. Spitler was asked to refresh his memory, and see if Price did not state on the preliminary ex-

amination that when the defendant was told that his sister was dead, "he seemed to be considerably broke up over it." Looking back at the testimony of Price, we observe that the question was: "Did you not say in answer to a question of Mr. Gilbert, that he seemed to be considerably broke up over it?" The answer of Price was: "I think it amounts to about the same thing." Having admitted the making of the statement, the impeaching question was wholly immaterial, and had no foundation on which to rest.

X. It is contended that the testimony of John M. Crowell was erroneously admitted. The point of objection is that he testified as an expert, as one skilled and experienced in detecting crime from the appearance of those charged with it. It is true, the prosecution seemed from the questions to have attempted to use the witness as an expert, but without success. He stated that for fifteen years he had been a post-office inspector, had had considerable to do with criminals; that he saw the defendant at the Baldwin house while his sister was lying dead there, and observed and conversed with him; and the witness was then asked if in his experience in dealing with criminals it was his opinion that the defendant had the appearance of being a guilty man. This was very properly excluded by the court; and in another part of the examination, where the witness volunteered the opinion that the defendant looked guilty, the court promptly admonished the jury that the statement was not evidence, and should not be considered by them. It is true that the witness was permitted to state that the defendant did not appear to be grieved. This testimony, as we have already seen, is allowable, and the fact that the witness was an intelligent and observing man, with a knowledge of physiognomy, certainly could not make his testimony that the defendant showed no signs of grief, incompetent, or any the less valuable. It seems to us that the judge was careful and alert in guarding the interests of the defendant, in excluding the illegal testimony of this witness, and by allowing him to speak only as an ordinary witness.

XI. The only remaining objection to the rulings upon the

evidence, is to the testimony of Dr. Campbell, who was a practicing physician of more than twelve years' experience. He testified as an expert, and, after showing some of the effects of chloroform upon the human system, was asked : "How is it regarded by medical authority upon that subject, and by medical men who are authority upon that subject?" He answered :

"It is regarded by writers on that subject, and by all men who have used it to any great extent, and by all universally, so far as I know, as a very dangerous agent, and an agent if pushed beyond a certain point, which will produce death; that is, in danger always of producing death. To be sure a great many men have used it a great deal, and have had no bad results from it."

Although the courts are not uniform in their holdings upon the admissibility in evidence of medical and scientific books, the great weight of authority is that they cannot be admitted to prove the declarations or opinions which they contain : this upon the theory that the authors did not write under oath, and that their grounds of belief and processes of reasoning cannot be tested by cross-examination. But while the books are not admissible, an expert witness is not confined wholly to his personal experience in the treatment of men, but his opinions formed in part from the reading of treatises prepared by persons of acknowledged ability may be given in evidence. So also may a witness refresh his recollection by reference to standard authorities; but the judgment or opinion which he gives must be his own and not merely that of the author. In an early case it was proposed to show what the received opinion of the medical profession was in a certain matter, by introducing medical books. The ruling was that they were not admissible, but that the witness might state what he had found laid down in the books in the course of his reading. The witness, who was Sir Henry Halford, president of a college of physicians, stated that he considered the medicine in question proper, and that it was sanctioned by the books and authorities, and also stated that the writings of certain authors were considered authority by the medical profession. It was then objected

2 — 36 KAS.

that the medical books could not be cited, but the authors themselves should be called.   Chief Justice Tyndall responded:

"I do not think the books themselves can be read, but I do not see any objection to your asking Sir Henry Halford his judgment and the ground of it which may be in some degree founded upon books as a part of his general knowledge." (*Collier v. Simpson*, 5 C. & P. 460.)

The present case falls within this authority.   Dr. Campbell is shown to be a man of large experience and extended reading in his profession, who had given his own opinion, and it was not improper for him to state that the opinion was formed from the study of books and men, and also that all the writers and authorities on the subject so far as he knew supported him in that opinion. (*Carter v. The State*, 2 Ind. 617; Lawson's Expert and Opinion Evidence, 176; Rogers on Expert Testimony, 234; Whar. Cr. Ev., § 538.)

XII. The defendant's counsel prepared and requested the giving of a series of instructions which the court declined to give, and the refusal of these constitutes sixteen of the alleged errors.   Although a few of the instructions requested were incomplete and inaccurate statements of the law, in the main the requests were correct and applicable; but the court, instead of adopting the phraseology and order of those requested, as seems to be its custom, prepared an elaborate charge in language of its own choosing.   The charge given was clear and symmetrical, and embraced the law of all proper requests made by the defendant, in language, to say the least, equally as apt and accurate as that employed in the instructions requested; and indeed it seems to us that the court advised the jury upon and illustrated every element of the law applicable to the case. It would be unprofitable to extend this opinion so far as to point out in detail where each proper request is included in the charge given, as the difference is one of words merely, and those not included are so obviously improper as to require no special notice.

XIII. We will notice some of the objections urged against

the instructions that were given.    In the nineteenth instruction, the court stated that—

"Before the defendant can be convicted of murder in the first degree, under the first count of the information, the following facts must be established by the evidence beyond a reasonable doubt: 1. That said Mary Baldwin came to her death by an anæsthetic called chloroform; 2. That chloroform is a poison; 3. That said poison was administered to said Mary Baldwin by the defendant in the county of Atchison and state of Kansas; 4. That said poison was administered by the defendant willfully, knowingly, and with the intention of taking the life of said Mary Baldwin, on or about the 8th day of July, 1885; 5. That said Mary Baldwin actually died from the effects of the chloroform so administered to her.    If, however, you find that chloroform is a poison, and that its administration to the said Mary Baldwin produced asphyxia resulting in death, this would be a death from poison within the meaning of the law. If you find the existence and concurrence of each and all of the five foregoing propositions beyond a reasonable doubt, then it is your duty to find the defendant guilty of murder in the first degree, as charged in the first count of the information herein; but if you have a reasonable doubt of the existence of any one of said five propositions, then it will not be your duty to find the defendant guilty of murder in the first degree under said first count."

To this instruction two objections are made, the first of which is that the elements of malice and premeditation were omitted and not held to be essential to a conviction.    It will be observed that the court told the jury that it must be shown that the defendant purposely took the life of the deceased by administering poison to her.    The act described, and in fact, any murder committed by means of poison, as well as by lying in wait, involves and presupposes the elements of malice, premeditation and deliberation, and hence it was needless for the court to state that they are prerequisites to a conviction.

One of the five general facts stated by the court to be necessary, in order to establish the guilt of the defendant, was that chloroform is a poison, and because the court, in stating the third and fourth prerequisites to a conviction, used the words "said poison," it is argued that it assumed it to be a

fact that chloroform is a poison; and this is the other objection to the instruction. It may well be doubted whether it would be error to assume the existence of a fact of such universal knowledge as that chloroform is a poison. But, however that may be, it is clear that the instruction will not admit of that interpretation. The jury were told that this fact was essential, and one of the first to be found; and having found chloroform to be a poison, then they were in effect told that it must appear that said poison so found was administered by the defendant at the time and place charged, and with the intention of taking the life of his sister. Then, in the concluding sentences of the instruction, the jury were reminded again that this was one of the essential facts to be found, and that the existence and concurrence of each and all of the five propositions must be found by them beyond a reasonable doubt before they could convict.

XIV. The twentieth instruction is the subject of considerable criticism. Its language is:

"It may be necessary to explain to you to a certain extent some of the terms used in the information, and others of a kindred nature. An 'anæsthetic' is defined by Webster in his dictionary as 'that which produces insensibility to pain.' Chloroform is defined by him as 'an oily liquid of an aromatic ethereal odor, consisting of carbon, hydrogen, and chlorine. It evaporates speedily, and has a specific gravity of 1.5. It is an important anæsthetic agent, and is also used externally to alleviate pain. It is also a powerful solvent, dissolving easily wax, spermaceti, resins, etc.' 'Asphyxia' is defined by the same authority as 'originally a want of pulse, or cessation of the motion of the heart and arteries;—as now used, apparent death, or suspended animation, particularly from suffocation or drowning, or the inhalation of irrespirable gases;—recently applied also to the collapsed state in cholera, with want of pulse.' 'Poison' is also defined by Webster as 'any substance which, when introduced into the animal organization, is capable of producing morbid, noxious or deadly effect upon it.' In some of the editions of his work he makes the following comments: 'All medicines possessing sufficient activity to be of much value are always poisons in inordinate or excessive quantities, and everything poisonous

is capable of proving medicinal in suitably reduced quantities. There are as many different modes in which poisons operate as there are different and distinct medicinal powers of any material activity.' In the American Cyclopedia 'poison' is defined as 'any substance which, introduced in small quantities in the animal economy, seriously disturbs or destroys the vital functions. Under this head are obviously included a vast number of bodies belonging to the mineral, vegetable and animal kingdoms, some solid, others fluid, and others gaseous, and deleterious vapors and miasmata imperceptible to the senses;' and in the same article the same authority also states that 'among the multitude of substances that rank as poisons are many, some possessing the most active qualities, which are also useful drugs, and which, administered in suitable quantities, are recognized among medicines in universal employment, and of the most beneficial character. The difference between a medicine and a poison is frequently a mere question of dose, and the line which divides them is sometimes narrow.' As the question is raised by the evidence in this case, whether chloroform is a poison or not, the court also deems it proper to state that it is a powerful anæsthetic agent, having been discovered so recently as 1831; and not having come into use by the medical profession until 1847, there may be some room for a difference of opinion as to its powers, properties, and effects. In common parlance, however, chloroform is classed among the poisons; and by the pharmacy act passed by the legislature of this state in 1885, it is expressly named as one of the things which it is unlawful for any person to sell, (except to physicians, photographers, or upon prescriptions,) without being labeled as a 'poison.' The lawful and general use of chloroform is for the purpose of producing insensibility to pain during surgical operations and other painful processes, and in such cases it is generally administered by physicians and surgeons and their assistants."

In regard to the foregoing instruction, it is stated that the court in quoting the definitions given in the books, transgressed the rule which forbids the introduction in evidence of books of authority, or of any citation therefrom. It is the duty of the court to advise the jury what questions are submitted for their consideration, and the rules of law applicable in determining the same; and it may also review the facts of the case, provided the jury are informed that they are the ex-

clusive judges of the facts. (Crim. Code, § 226.) In charging the law, it falls within the province and duty of the court to determine the sufficiency of the indictment or information, and to define and make plain the words used in charging the offense. By § 107 of the criminal code, it is provided that "The words used in the indictment or information must be construed in their usual acceptation and common language, except words and phrases defined by law, which are to be construed according to their legal meaning." Testimony is necessary where the words have a local meaning different from their ordinary acceptation, or where they have acquired a peculiar meaning in some science, art, or trade. But the court takes notice of the meaning and force of the ordinary words of our language, and also of technical words, where the meaning is well settled by common usage, and may, where it is necessary, define and explain them to the jury. The supreme court of Massachusetts held that—

"The general rule of law is that the construction of every written instrument is a matter of law, and as a necessary consequence, that courts must in the first instance judge of the legal force and effect of the language. The meaning of words and the grammatical construction of the English language, so far as they are established by the rules and usages of language, are *prima facie* matter of law to be construed and passed upon by the court." (*Brown v. Brown*, 8 Met. 573. See also 1 Greenl. on Ev., § 5; Thompson on Charging the Jury, § 18; Rogers on Ex. Test., § 121; *Rodgers v. Kline*, 56 Miss. 818; *Haley v. The State*, 63 Ala. 89; *Gibson v. Cincinnati Enquirer*, 5 Cent. L. J. 380.)

The words "anæsthetic," "chloroform" and "poison" were used in the information, and by the court in other parts of its charge. They are words in common use in our language, and have a well-settled meaning which is not local, and cannot be regarded as technical or peculiar. It was therefore proper for the court to aid and enlighten the jury by defining the words and giving their usual meaning and acceptation in common language. It is true the court quoted the definitions given in Webster's Dictionary and the American Cyclopedia,

but there is no claim that the definitions are incorrect in any respect. What cause then is there for complaint? By incorporating the definitions and comments of those authorities in the instructions, the court approved them, and made the language employed in them its own; and as the definitions are in no way faulty, the defendant has no reason to complain that the language employed by the court had formerly been used by others. It may be stated that what was said regarding these words, as well as of "asphyxia," is not at all at variance with the testimony, and if the words defined were all treated as technical terms in science, and what was said of them as facts, still the court, as we have seen, had a right to sum up and present the facts of the case, so long as the jury were told that they were the exclusive judges of all the questions of fact; and this was done.

Neither do we think there was error in the statement of the court that in common parlance chloroform is classed as a poison. There may be some difference of opinion respecting some of its properties and effects; but it seems to us that it is regarded by the masses of the people as a poison. In addition to the fact that it is so classed in the books, the legislature of the state has published it as a poison, and required that it shall not be sold except upon prescription, or to physicians or photographers, unless the vessel in which it is contained, as well as the outside wrapper, shall be distinctly labeled "Poison;" nor unless upon due inquiry it is found that the purchaser is aware of its poisonous character. (Laws of 1885, ch. 150, § 12.) This law, which all are presumed to know, places the same restrictions upon the sale of chloroform as is done in the case of arsenic, corrosive sublimate, and strychnia, and classes it with aconite, belladonna, digitalis, oxalic acid, "and other virulent poisons." In view of these facts, it cannot be well claimed that the court erred in telling the jury that in common parlance chloroform is classed among the poisons. The court, however, did not take from the jury the question as to whether it is a poison; but when the instructions are read together, it will appear that what is complained of is beneficial

rather than otherwise to the defendant. It was only saying that although chloroform is generally regarded by the masses of the people as a poison, yet they must not take that for granted, but, before the jury could convict, they must, from the evidence, find it to be a poison beyond a reasonable doubt.

XV. The court instructed the jury upon the law of descents and distributions, stating fully what would be the rights of the defendant under the law upon the death of his father; the direct and remote effect of his sister's marriage; and his rights as heir of his mother, if he should survive her. In closing the instruction, the court stated:

" Whether the defendant had knowledge of all these rules of descents and distributions does not clearly appear; and if he committed the crime charged against him, he may or may not have been mistaken as to the direct or the remote probabilities of gain from his sister's death; and his motive should be judged from his supposition as to the law of descents and distributions, rather than from the accuracy of his views upon that subject."

It is urged that by the giving of this instruction the jury were sent into the field of conjecture and speculation to find a motive of the defendant for the commission of the offense. It should be remembered that the father of the defendant had died leaving a large estate, and his only heirs were the widow, the deceased, and the defendant. The deceased was about to be married, and the mother was well advanced in years, and an invalid. The defendant had spent a large part of the money he had received from the estate, and was in great need of money. Upon the inquiry of the defendant, the probate judge testified that he explained to the defendant the law of descents and distributions, but just what he said the law is, is not shown. The defendant asked the court to instruct the jury regarding motive, and upon the law of descents and distributions, and this request, together with the circumstances of the case, certainly justified an instruction upon that subject. Nor was there error in the last part of the instruction, where the jury were in effect told with respect to motive, that the

defendant should be judged by the informat'on upon which he acted, rather than upon the accuracy of his information.

XVI. It is next contended that the verdict is contrary to the evidence. In respect to the evidence, we need only to quote from the able opinion given by the trial judge in overruling the motion for a new trial:

"Was the jury justified in finding the defendant guilty upon the evidence adduced? The theory of suicide was extremely improbable; and the jury would perhaps be justified upon the evidence in believing that the entering of the dwelling was not for the purpose of rape, robbery, or larceny. With these motives and theories eliminated, the jury would be almost driven to one of two conclusions: either that Mary Baldwin was murdered by an enemy for the purpose of revenge, or by some person who hoped to gain by her death. In this view the range of probabilities as to her murderer is narrow and circumscribed. The circumstances do not point toward any person other than the defendant. Do they point to him with sufficient precision to justify the jury in saying that he is guilty beyond a reasonable doubt?

"It is reasonably certain that Mary Baldwin died from the effects of chloroform, which had been purchased of Benjamin F. Binswanger, at Brokaw's pharmacy in St. Joseph, Missouri, at some time after January 12, 1885. The defendant told Lewis H. Haynes, in April, May, or June, 1885, that he was going to St. Joseph. Mr. Binswanger was not asked in the court if he recognized the defendant as the person who purchased the chloroform. He only stated that when the photograph (admitted to be that of the defendant) was shown to him at St. Joseph, he thought it made an impression that he had seen the same face before. There is no testimony that any person saw the defendant near his mother's house on the night of July 7, or the morning of July 8, 1885; but he resided only three or four blocks away, and he admitted to two persons that he was out that night, and to one of them that his wife was crying when he returned. Some marks in and about the panel seem to have been made by a knife having a blade like the one in the pocket-knife which the defendant carried. The door was probably open when the panel was cut out. This is indicated by the small cuttings which Mrs. Farries took to be sawdust, lying about eighteen inches inside of the door. This fact, together with some others, probably

justified the jury in believing that the murderer resorted to a ruse to create a false impression that the house had been entered by a burglar for the purpose of robbery or larceny.

"These are substantially all of the circumstances tending directly to connect the defendant with the crime. A motive on the part of the defendant for the commission of the crime was perhaps sufficiently shown, if it be admitted that a man could be base enough to murder his own and only sister, for the direct or remote prospect of adding a few thousand dollars to his fortune. Much of the testimony relates to his conduct soon after the tragedy, and the jury perhaps believed that his actions ill comported with his innocence of the cause of his sister's untimely death. It must be admitted that the evidence of the defendant's guilt is not entirely conclusive, but it is of such a nature that honest and intelligent men may differ in opinion as to its sufficiency to justify a verdict of guilty." (2 Kas. Law Jour. 326.)

Although the testimony written in the record is not as full and satisfactory as we would wish, after a careful reading we are constrained to the opinion of the trial judge that it is sufficient to uphold the verdict.

XVII. The effort of the defendant to show that the jury were influenced by the alleged prejudice and conduct of the people who attended the trial, is a failure; and the same may be said of his attempt to show that some of the jurors were disqualified, and had expressed opinions prior to the trial that the defendant was guilty of murdering his sister. Upon this question the testimony was oral and conflicting, and in such a case the finding of the trial judge, like the verdict of the jury, is conclusive upon this court. (*The State v. Bohan*, 19 Kas. 56; *The State v. Tatlow*, 34 id. 80.)

In concluding this opinion, we will say that the gravity of the offense, the peculiar circumstances surrounding the case, and the great earnestness and ability with which counsel for defendant has pressed his points upon the court, have led us to examine the record with great care. The testimony given, as well as every point made and authority cited, has been considered with that anxious attention which the consequences of a conviction demand; but we are forced to the conclusion

that the case has been well and fairly tried, that the errors committed are technical and unimportant, and not such as would justify a reversal of the conviction. We will therefore affirm the judgment of the district court.

All the Justices concurring.