NOT DESIGNATED FOR PUBLICATION

No. 112,096

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

DAVID J. HAGAN,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed December 4, 2015. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Judge, assigned.

*Per Curiam*:  David J. Hagan appeals his conviction of aggravated battery, criminal threat, and aggravated weapons violation by a convicted felon. Hagan argues that the oath taken by the jury was unduly coercive and deprived him of his right to due process and a fair trial before an impartial jury. But he has failed to preserve this issue for appeal.

Hagan also argues that there was insufficient evidence to convict him of criminal threat. This court has reviewed the evidence and finds that the evidence is sufficient for a

1

rational factfinder to conclude that Hagan acted intentionally. Thus, we affirm his convictions.

FACTS

In the afternoon of February 7, 2014, Jacob Silcott received a call from Hagan. Silcott and Hagan had been friends for 6 years, even occasionally eating and staying at Silcott's family's home. Hagan called Silcott that day because he was hungry and upset that he was stuck at his own place and wanted Silcott to come pick him up. According to Silcott, Hagan was "upset that these people were hacking his phone" and "sounded angry." At trial, Silcott testified that he couldn't remember exactly what Hagan said but was concerned and uneasy about some of Hagan's comments and that his tone of voice "wasn't normal."

After getting off the phone with Hagan, Silcott tried to call his younger sister, Odessa, at home, but she didn't answer the phone. Silcott then called his neighbor, Greg McHargue, and asked him to check on his sister. Silcott was aware that Hagan regularly carried a 6- or 7-inch knife. In the meantime, Silcott drove home from about 20 minutes away.

According to McHargue, Silcott asked him to check on Odessa because "a friend of his was going to come kill his family." Nothing in the record suggested that Hagan and Silcott had fought or otherwise explained why Hagan would threaten Silcott. McHargue testified that Silcott sounded scared and anxious and was stuttering. McHargue drove over to the house and told Odessa to lock the door while he made sure everything was okay. McHargue was driving up the block when he saw Hagan walking down the street at a fast pace.

After stepping out of his car to speak to Hagan, McHargue noticed that Hagan was carrying a 6-inch knife in his right hand. McHargue testified that Hagan told him "that he

2

had just killed someone, he'd kill me if I get in the way, and he'd come to kill the family." A fight ensued and McHargue was stabbed in his arm and wrist. Hagan then took off towards the Silcott house while McHargue ran to his car and called 911.

At some point, Silcott spoke to Odessa by phone and told her to get out of the house because Hagan was coming over. According to Odessa, Silcott sounded worried and angry. Odessa knew that Silcott didn't want Hagan coming over to the house anymore. She was unable to leave the house because she saw Hagan outside, so she locked herself in the bathroom until her brother arrived.

Eventually, the police arrived and found the garage door open and a large boot print on the door connecting the garage and house but determined that Hagan never entered the house. Officer Trinidad Balderas followed footprints in the snow from the backyard that led to Hagan, who was hiding in a yard a few blocks away. After Hagan was arrested and taken away, Officer Brandon Vrbicky called to interview Silcott about what had happened. Vrbicky testified that Silcott told him that Hagan threatened to kill his family. During the interview, Silcott told the officer he believed Hagan was the kind of person who would follow through on the threat.

Hagan's trial began on May 20, 2014. The following day, a jury found Hagan guilty of aggravated battery, criminal threat, and an aggravated-weapon violation by a convicted felon. He was sentenced to 48 months in prison with 12 months' postrelease supervision.

ANALYSIS

*Oath taken by the jury*

Hagan contends that the oath provided to the jury was unduly coercive and deprived him of his right to due process and a fair trial before an impartial jury. The oath

3

administered to the jury asked, "You do solemnly swear that you will conscientiously try the issues in the case now in hearing and return a verdict according to the law and the evidence so help you God?" It is important to note that Hagan did not object at the time the oath was administered.

In general, constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court. *State v. Bowen*, 299 Kan. 339, 354, 323 P.3d 853 (2014). Despite the exceptions to this rule, Hagan fails to abide by Kansas Supreme Court Rule 6.02(a)(5) (2014 Kan. Ct. R. Annot. 40) by explaining why the issue is properly before the court. As our Supreme Court has recently emphasized, "Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); see *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). Therefore, we find that Hagan's failure to comply with Rule 6.02(a)(5) amounts to an abandonment of his constitutional claims.

Additionally, the Kansas Supreme Court has held that a party must object before or during the administration of the oath to the jury in order to preserve the issue for appeal. *State v. Baldwin*, 36 Kan. 1, 7-8, 12 P. 318 (1886). In *Baldwin*, a defendant appealed from his conviction for first-degree murder, and among the many challenges he raised on appeal, the defendant claimed that the oath given to the jury "omitted the essential part of requiring that they should a true verdict give according to the law and the evidence." 36 Kan. at 5-6. Our Supreme Court refused to consider the defendant's argument, explaining that "[a] party cannot sit silently by and take the chances of acquittal, and subsequently, when convicted, make objections to an irregularity in the form of the oath." 36 Kan. at 8. In *State v. Dwigans*, 51 Kan. App. 2d ___, 356 P.3d 412 (2015), *petition for rev. filed* September 1, 2015, a panel of this court relied upon *Baldwin* when it refused to consider a similar argument because the defendant in that case also failed to object when the oath was administered.

4

Much like the defendant in *Dwigans*, Hagan acknowledges the holding in *Baldwin* but seeks to distinguish his case by arguing that he takes issue with the "language used in the oath" rather than the "administration" of the oath. As the panel in *Dwigans* noted, however, the defendant in *Baldwin* also took issue with the language of the oath provided by the court. *Baldwin*, 36 Kan. at 6; *Dwigans*, 356 P.3d at 414. We similarly believe that *Baldwin* is directly on point and that Hagan cannot remain silent during the oath's administration if he truly believed there was a problem with the language. Therefore we find that Hagan has not preserved the issue for appeal.

*Sufficiency of the evidence supporting Hagan's conviction for criminal threat*

Hagan argues there was insufficient evidence to convict him of criminal threat because the State failed to prove that he threatened Silcott with the intent to place Silcott in fear.

In determining whether the State has produced sufficient evidence to sustain a conviction, this court reviews all the evidence in the light most favorable to the prosecution and determines whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Longoria*, 301 Kan. 489, Syl. ¶ 30, 343 P.3d 1128 (2015). This court does not reweigh the evidence, resolve conflicts in the evidence, or determine witness credibility. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

Hagan correctly points out that the charging document and jury instructions set out different standards for criminal threat. The relevant portions of the charging document provide the following: "[O]n or about the 7th day of February, 2014 . . . DAVID J. HAGAN did then and there unlawfully threaten to commit violence, communicated *with the intent to* place another in fear, to wit: Jacob E Silcott, *or in reckless disregard* of the risk of causing such fear." (Emphasis added). However, the jury instruction on criminal

5

threat only includes an intentional state of mind. The instruction stated: "To establish this charge, each of the following claims must be proved: 1) The defendant threatened to commit violence and communicated the threat with the intent to place another, Jacob Silcott, in fear. 2) This act occurred on or about the 7th day of February, 2014." The jury does not see the charging document. The district court's instructions establish the elements of the crimes the jury is to consider. The elements contained in the instruction in this case are more burdensome than those required to prove the reckless alternative contained in the charging document. The instruction requires the State to prove that Hagan made the threat specifically intending to cause fear in Silcott. According to Hagan, because the State did not present evidence about his state of mind or the reasons he threatened Silcott, the State did not prove he acted intentionally and his conviction should be reversed.

A person acts intentionally or with intent when it is the person's desire or goal to engage in the conduct or cause the result claimed by the State. K.S.A. 2014 Supp. 21-5202(h); PIK Crim. 4th 52.010. Because people rarely announce the intent behind their criminal actions, "'[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts. [Citations omitted.]'" *Williams*, 299 Kan. at 525; see *State v. Hurd*, 298 Kan. 555, 568, 316 P.3d 696 (2013) (noting circumstantial evidence can be used to prove specific intent in criminal threat cases); *State v. Rodriguez*, No. 110,604, 2014 WL 6777430, at *4 (Kan. App. 2014) (unpublished opinion), *rev. denied* July 22, 2015. In finding a defendant guilty, "the jury is presumed to have believed the State's evidence and to have drawn from it all reasonable inferences favorable to the State." *State v. Kettler*, 299 Kan. 448, 472, 325 P.3d 1075 (2014). The circumstantial evidence does not need to exclude every reasonable conclusion or inference to support a conviction. *State v. Ramirez*, 50 Kan. App. 2d 922, 936, 334 P.3d 324 (2014) (citing *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 [2008]). A guilty verdict will only be reversed in the "rare cases in which trial testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt."

6

*Ramirez*, 50 Kan. App. 2d at 936 (citing *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 [1983]).

The evidence at trial, when viewed in the light most favorable to the prosecution, was sufficient for a rational factfinder to find Hagan guilty of criminal threat. Silcott testified that Hagan was angry and that he was concerned by Hagan's comments and tone of voice. Although Silcott could not remember exactly what Hagan said to him, he certainly responded to the phone call as if Hagan had threatened his family. Immediately after speaking to Hagan, Silcott tried to reach his sister to warn her that Hagan was on his way over. He then called McHargue and asked him to go check on her. McHargue testified that Silcott sounded anxious and scared. McHargue and Officer Vrbicky both testified that Silcott said Hagan threatened to kill Silcott's family. In convicting Hagan of criminal threat, the jury accepted the testimony of the State's witnesses and determined that Hagan had threatened to kill Silcott's family. The jury could reasonably infer that Hagan made the threat in order to cause fear in Silcott. The State was not required to put on direct evidence of Hagan's state of mind or explain why he threatened Silcott.

Affirmed.

7